1

2

3

4

5

6

7

8                              UNITED STATES DISTRICT COURT

9                              EASTERN DISTRICT OF CALIFORNIA

10

11   JERMAINE MICHAEL DEAN,              )   Case No.: 1:11-cv-00970-LJO-JLT
                                         )
12              Petitioner,              )   FINDINGS AND RECOMMENDATION TO
                                         )   DENY PETITION FOR WRIT OF HABEAS
13        v.                             )   CORPUS (Doc. 3)
                                         )
14   M. McDONALD,                        )   ORDER DIRECTING THAT OBJECTIONS BE
                                         )   FILED WITHIN TWENTY-ONE DAYS
15              Respondent.              )
                                         )
16   _____)

17        Petitioner is a state prisoner proceeding pro se with a petition for writ of habeas corpus

18   pursuant to 28 U.S.C. § 2254.

19                                    **PROCEDURAL HISTORY**

20        Petitioner is in custody of the California Department of Corrections and Rehabilitation

21   ("CDCR") serving an indeterminate sentence of life without the possibility of parole, pursuant to a

22   judgment of the Superior Court of California, County of Stanislaus (the "Superior Court") for his 2007

23   conviction following a jury trial for, inter alia, first degree murder with special circumstances.   The

24   jury also found that Petitioner had suffered two prior felony convictions and that he had used a firearm

25   in the commission of a robbery.  Petitioner was sentenced to a term of life without the possibility of

26   parole plus a 25-years-to-life term for the firearm enhancement plus additional five-year terms for each

27   of the two prior felony convictions.  (Clerk's Transcript ("CT") 1608; 1610; 1613-1616).

28        Petitioner subsequently filed a direct appeal in the California Court of Appeals, Fifth Appellate

                                              1

District (the "5th DCA"), which, in an unpublished decision, affirmed Petitioner's conviction on June 29, 2010.  (Lodged Document ("LD") 4).   On August 4, 2010, Petitioner filed a petition for review in the California Supreme Court that was summarily denied on October 13, 2010.  (LD 5; 6).

On June 3, 2011, Petitioner filed the instant petition.  (Doc. 3).  Respondent's answer was filed on September 13, 2011.  (Doc. 22).  On November 14, 2011, Petitioner filed his Traverse.  (Doc. 27). Respondent does not content that any grounds for relief are unexhausted.

## FACTUAL BACKGROUND

The Court adopts the Statement of Facts in the 5th DCA's unpublished decision[1]:

### I.  Prosecution Evidence

The Homicide and Investigation

In March 2002, T. and Jose "JoJo" Ruiz lived with their two children, eight-year-old R. and five-year-old E., in a house on Montilla Lane, a small cul-de-sac in Modesto.  Ruiz was known to police as a member of the West Side Boyz, a Norteno gang. He was also known as one of the major distributors of base cocaine in west Modesto, and federal authorities planned to serve a search warrant on his residence within a matter of days.  In the year or so before the events of this case, Ruiz regularly bought cocaine by the kilo, cooked the cocaine and turned it into rock form, and then sold the product mostly by the ounce.  According to T., Ruiz did not sell drugs from their residence or keep more than small amounts of cocaine there, although he sometimes prepared, cooked, or packaged the drugs at the house.  During the time period, he sometimes had large sums of cash hidden in different parts of the house. There was a safe with an electronic lock in the master bedroom closet. Ruiz usually did not keep any money there, however; instead, he kept a Taurus nine-millimeter semiautomatic pistol in the safe for protection.

Phillip Collins and Ruiz had known each other since about the third grade and, at the time of Ruiz's death, were, according to Collins, "pretty much best friends."  T. was acquainted with Collins and was aware that he and Ruiz were in the drug business together.  T. felt Collins could potentially be a backstabber to Ruiz.

In July 2000, Collins, having twice sold crack cocaine to an undercover officer and informant, was given the option of getting eight to 10 years in prison or turning in his friend. He chose to turn in his friend and, to that end, signed a contract with the Modesto Police Department that was approved by the district attorney's office. Pursuant to the agreement, Collins was required to buy drugs from Ruiz, Ruiz's brother Javier Ruiz, and another individual in controlled settings, and to testify as needed, in return for which he would plead guilty to one count of selling drugs, and be sentenced to local time and three years' probation. He was required to obey all laws and make all court appearances, and to keep Modesto Police Sergeant Helton advised of his residence and whereabouts. Helton would contact Collins when a purchase was to be made, then tell him from whom to make the buy. Collins would then arrange the deal, buy the drugs, and give the drugs to the police. He was wired for sound during the transactions, and the police gave him money to make the purchases.

---

[1] The 5th DCA's summary of the facts in its unpublished opinion is presumed correct.  28 U.S.C. §§ 2254(d)(2), (e)(1). Thus, the Court adopts the factual recitations set forth by the 5th DCA.

Under the supervision of Helton and FBI Agent Tim Hammond, Collins made approximately 20 controlled buys from Ruiz or his associates.  The quantities purchased ranged from an ounce to a quarter kilo.  Helton considered Collins very reliable and one of the better informants with whom Helton had worked.  Federal grand jury indictments were obtained in February 2002, and served in March, with the prosecution of Ruiz's associates concluding in late spring 2003, when they all pled guilty in federal court.  According to Helton, Collins would not have been privy to the status of the investigation and would not have been told when arrests and indictments were imminent.  He was not to receive any consideration for his participation in the case concerning the Ruiz homicide. Ultimately, Collins never pled guilty to anything or served time in jail, and was told he would not be prosecuted on his case.

In 2002, Collins was acquainted with Trice (known to him as Roach), knew of Nichols (known as Bam or Bam Bam), and came into contact with Dean (known as J Dogg).  Collins, who had suffered two felony convictions prior to 2002 and been sent to the California Rehabilitation Center (CRC) for one, had gotten to know Trice during the 13 months both were at CRC.  During the time Collins was at CRC, Blood, Crip, and Sureno gang members were there.  The Bloods wore red and the Crips wore blue.  Trice, who was from the Pasadena Denver Lane Bloods (PDL) and had "Pasadena" and "DL" tattoos, mostly associated with those wearing red, and Collins saw him "throw[ ]" a Blood sign with his hands.  Bobby Blueford was also in CRC with Collins and Trice.

As CRC's inmates were all there for drug offenses, they sometimes bragged about the drug crimes they committed or the great connections they had.  Collins did so with PDL members. He let Trice and Blueford know that if they were ever in his area, he had a good drug connection in Modesto. He probably told them that he had his main connection, and that the person was his Mexican partner.  He also probably talked about the quality of the drugs the man had, that the man was able to get as much as they wanted or needed, and that he would sell it to Collins for a fair price. Collins was talking about Ruiz, but he did not believe he ever mentioned the name to any of the PDL members.

While in CRC, Collins and Trice associated on a daily basis. After they got out of CRC, they ran into each other in Merced, where Trice had family. This was a couple of years before Ruiz was killed. Collins observed Trice making hand-to-hand drug sales. Whenever Trice was coming to Merced from Pasadena, he would give Collins a call and they would get together.

The week before the weekend of Ruiz's murder, Trice called Collins at Collins's home in Atwater and said he was coming down for the weekend and would call when he got into town. Trice came by Collins's house sometime on Friday. Blueford, Dean, and Nichols were with him. They arrived in a silver Lincoln Town Car. The car looked new, and one of them said it was a rental. After some general conversation, the topic turned to drugs. Collins mostly spoke with Trice, who wanted to know how and where to get a quarter kilo of rock cocaine. Trice asked Collins several times that day to hook him up with someone who had that much.  Trice asked Collins if Collins could hook them up with Collins's "Mexican homeboy," the connection about whom Collins had talked while in CRC.  Trice kept asking when they could go get it and how much it would cost. Collins knew that under the terms of his contract with the police department, the whole deal could be off if he broke the law or sold drugs, so he knew he could not set up the contact. He told Trice he would hook them (appellants and Blueford) up and to give him a call the next day or the day after, but he was just playing Trice. He was drinking at the time, however, and told appellants and Blueford that his connection had a lot of drugs stashed and a lot of money, and the kind and color of his car.  Helton had contact with Collins late Friday morning; Collins said nothing about knowing of people who were trying to make buys from Ruiz, even though he was under an obligation to notify Helton anytime there was a possible sale of drugs involving Ruiz.  Likewise, Collins did not contact Hammond, his federal handler, although he knew Hammond would be very interested.

3

Berenice Sanchez lived on Hasley Drive, across the street from the Ruiz home. One or two days before Sunday, March 3, a black, lowered Chevrolet pickup truck drove slowly by and then stopped briefly on Hasley.  Its two occupants looked at the Ruiz house. A little while later, another vehicle—a newer, possibly four-door, light-colored or grayish or white Lincoln with tinted windows—did the same thing, although this one stopped around the corner.   This was odd, because usually someone turning into the cul-de-sac by mistake would just drive on around in a U-turn and go back out.

On Saturday, Collins was at a wedding, but caller identification records on his phone showed that Trice called several times during the day. Collins called him back at least once and said he was busy that day and would call Trice back. Trice was calling too much, "bugging" Collins about drug sales. Collins did not know whether Trice called on Sunday; it was Collins's daughter's birthday, and Collins was away from home all day.

Around 8:00 p.m. on Sunday, March 3, T., R., and E. had dinner. Ruiz, who had been receiving a lot of calls on his cell phone before he went out for a while, was not home, although T. telephoned him during dinner and asked him to bring something from the market. After the meal, the children went to the bathroom to take a bath. About 15 minutes after she had talked to Ruiz, T. was cleaning up in the kitchen when she heard the front door open and close. There was a moment of silence, then T. heard Ruiz call her name in an urgent tone of voice and tell her to get down. She turned to look and saw him on the ground between the entryway and the kitchen. Two people were holding him by the back of his shirt and pointing guns at him. One was Dean. Another person—Trice—came around the corner with a black revolver pointed at T. and told her to get down. Nichols was the third person she saw. He was holding a black gun that was the biggest of the guns she saw. He pointed it at Ruiz.

T. got down on the floor, but was still looking at the intruders. She and Ruiz both started begging them not to let the children see what was happening. One or more of the intruders were telling them to put their heads down and not look at them. T. was still looking at Trice, and he told her, "'Bitch, put your head down.'"  When she objected to him calling her a bitch, he said it again and jabbed the gun toward her eye and told her again to put her head down. At some point during this time, one or more of the intruders said something to the effect that they just wanted the stash. T. interpreted this to mean they wanted money or drugs.

Dean told Trice to take T. to find the children. Trice walked her out of the kitchen and through the dining room. For reasons unknown to her, there was a pause, during which she stood in the dining area, between the dining and the living room area, for a moment. She saw someone walking down the stairs from the entryway.   Another person was standing in the dining area. At this point, she believed there were four intruders, total, in the house.   One or two were wearing a black beanie or cap with a red emblem on it. The hair that was not covered was either curls or braids. The other two were bare-headed and their hair was also either in braids or curls. Dean had the longest hair.

Up until this point, Trice had been watching over T. At some point, there was a transition in who was watching her. She thought it might have occurred during the pause, but was not certain. T. believed Trice then went toward Ruiz, but she did not see what he did. At some point, she saw Nichols direct the gun at Ruiz.

Meanwhile, the children had disrobed but, before they could bathe, E. told R. that their father's friends were there. R. went to see who they were. She saw around three African–American men coming through the door. The intruders were wearing black clothing and some were wearing beanies. One of the men had black hair done in shoulder-length braids. His face was skinny or bony, his nose was long and pointy, and his teeth protruded from his mouth. R. subsequently identified this man, through a photographic lineup and at trial, as Dean.

4

R. went back into the bathroom. She and E. were about to get into the bathtub when Dean entered the bedroom. He did not say or do anything, but went back out and then returned with T. He had a gun to the back of T.'s head and was holding one or both of her arms behind her back. He told her to get clothes for the children, so she and he left the room and returned with clothing that had been in the laundry room.  T., who was acting rushed, got the children dressed.

According to T., the man who was with her at this time—Dean—was the person who was in charge of her after the transition. He was with her the entire time she was in the bathroom. At one point, he took his eyes off her and started looking around the room. There was some jewelry on a dresser on the other side of the room, and he walked toward it.  T.'s purse was on the bed. Thinking it contained her cell phone, she went to grab it, but Dean saw her, pointed the gun at her, and told her to put the purse down. She threw the purse back onto the bed. She later discovered that her cell phone was missing. She could not recall if she recovered it.

Around this time, Trice and Nichols, who was wearing a light blue shirt, forced Ruiz to walk through the bedroom to the walk-in closet. Both had guns. The closet door opened inward into the closet; the safe was behind the door. The closet door was half open, and T. could see the back of Nichols's light blue shirt. She then heard gunshots, probably at least three initially. She started screaming, "'No,'" and saw Dean go to the closet door and start shooting inside the closet at a downward angle. He fired a few shots, then paused.  T. witnessed at least four shots going into the closet door. There were other shots still going off behind the door. She was screaming and crying and wanting to save the children, so she ran to the bathroom, opened the window and broke off the screen, then boosted R. up so she could climb out the window, and told her to run to the neighbor's house and tell them to call 911.  T. then tried to pick E. up and put him through the window, but he was screaming and so scared that he would not let her push him out. She told him to stay where he was, and by this time, the gunshots had stopped. T. believed she heard between five and 10 shots.

Meanwhile, as R. was running to the neighbor's house, she saw two of the intruders trying to leave by going over the chain-link fence next to the Ruiz house. One said to the other— Dean—that they had to get out of there, then he said a name that started with either R–A or R– O. Another intruder ran out of the garage, and Ruiz crawled out of the house like he was chasing the man. R. did not stop to look at him, but kept running to the neighbor's house across the street.  When the woman answered the door, R. said she thought her dad got shot, and then they called the police.

After the gunshots stopped, T. walked into the bedroom and did not see anyone. She then walked to the closet, but did not see anyone there, either. There was blood everywhere, however, and Ruiz's gun was on the closet floor. Although it appeared to have malfunctioned, she grabbed it anyway and followed the blood trail through the bedroom, down the hallway, and into the garage. She saw Ruiz on his hands and knees and ran out to him. He was spitting out blood and gasping for air. T. was screaming and told him to hang on, then ran back inside to get E. and a phone. She was talking to the 911 operator when she got back to Ruiz, and when she saw he was already lying still, she threw down the phone and rolled him onto his back. When a neighbor ran over to see what had happened, T. screamed that Ruiz had been shot. She then began performing CPR.

Modesto police were dispatched to the Ruiz residence at approximately 8:14 p.m. They arrived within minutes to find Ruiz down in the driveway, with a Taurus nine-millimeter semiautomatic handgun lying next to him. The gun, which had a 15–round magazine in it, appeared to have malfunctioned, as the slide was partially back and a round was sticking out of the ejection port.  T. was performing CPR on Ruiz, who had been shot and was bleeding profusely. Blood was trailing from him down the driveway, and it appeared that someone had made tracks through it. There was an odor of freshly burnt gunpowder in the house.

Modesto Police Officer Garcia spoke to T. at the scene. She described one of the perpetrators (none of whom she could identify by name) as a Black male adult in his mid- to late 20's, five feet seven inches and 170 pounds, and wearing a black beanie cap with hair sticking out of it. She said he was light-skinned and had a rough complexion, and horse teeth with big lips. He was wearing a black shirt or sweatshirt. She said this person shot into the closet door. She described a second perpetrator as a Black male adult in his early 30's, five feet eight inches tall and 230 pounds, with black hair in Jeri curls or braids, possibly collar-length. He was light-skinned and had a chubby, round face, and was wearing a blue jersey and possibly blue jeans. She said he walked into the dining room when the suspects came into the home. T. described the third perpetrator as a Black male adult in his mid- to late 20's, five feet nine inches tall and approximately 170 pounds, with short black hair and dark skin. She said he was wearing a black sweatshirt and was armed with a handgun, and that he pointed a gun in her face in the kitchen. The fourth perpetrator was a Black male adult in his late 20's or early 30's. T. had no further description of him. She informed Garcia that after she put R. out the bathroom window, she saw the man who shot into the closet walk northbound past that window.

Police searched the area in and around the Ruiz home shortly after the shooting. Entry to the house did not appear to have been forced; the front door was partially open and a set of keys was in the lock. In the hallway that led from the garage into the house and ultimately to the master bedroom, officers found two aluminum-colored CCI brand .380–caliber shell casings, bloodstains, and bloody handprints on the carpet. Inside the master bedroom itself were three more of the expended .380 shell casings. There were also bullet holes in various places in the room, and several expended copper-jacketed bullets were recovered. From the four bullet holes in the door of the master bedroom closet and associated gunshot residue, it was possible to ascertain that those shots were fired from the outside of the closet door inward. All four were fired in a downward, almost 45–degree angle. In the closet was an expended nine-millimeter shell casing that was believed to have been associated with the gun found by Ruiz's body. Also in the closet was a small safe with an electronic lock. The door was open and some of the contents were spilled out onto the floor. The trajectory of the bullets shot through the closet door was toward the general area of the safe. There were bloodstains in various places in the room. There was also blood in the closet, although not a lot. Bloodstain samples taken from the master bedroom were Ruiz's blood. The blood evidence essentially traveled a path from the master bedroom closet, through the area of the foot of the bed, down the hallway, to the garage, and to where Ruiz's body was located. Two dressers in the room contained cash in the amounts of $8,083 and $8,400. A box of .40–caliber ammunition was found in the master bedroom. It was the only box of ammunition found in the house. The box, which should have contained fifty .40–caliber rounds, contained forty-nine .40–caliber cartridges and one 9–millimeter round.

On the living room floor was a red-and-black knit cap with "California" embroidered on the front. It seemed out of place, since the rest of the house was fairly neat. On the floor of the dining room were a Nokia cell phone in its holder and four plastic zip ties that also seemed out of place.

The screen on the window of the master bedroom's bathroom was partially torn. Three shampoo bottles were on the ground underneath the window. A trail of items that appeared to have been taken from the house led to a hole that had recently been cut in the chain-link fence on the property line. Additional items and footprints led in a northerly direction. In a field directly north of the Ruiz residence, close to Woodland Avenue, officers located a black High Standard .22–caliber nine-shot rimfire revolver. At trial, T. identified this gun as looking similar to the one Trice pointed at her. Ruiz's blood was on the gun's cylinder. Footprint impressions in the grass and weeds indicated someone had recently run across the corner of the property. The direction of the footprints was northwest, toward Bennett Lane. A black-colored Sturm Ruger .357 Magnum revolver containing six expended shell casings was found

6

underneath a bush in the front yard of a house on Bennett. The lack of condensation, cobwebs, and dust on the gun indicated it had not been there long. At trial, T. identified this gun as looking like the one the fourth intruder (who was not present at trial) had. The trail of evidence was consistent with a getaway car being parked about a block from the Ruiz house.

Detective Brocchini went to the crime scene on the night of the shooting and spoke to Andre Ruiz. Andre Ruiz related that a neighbor said he heard the shooting, then saw an older Black male adult with a short Afro haircut, in an orange, primered minivan, begin to honk his horn. The neighbor said he then saw two Black subjects run from the area around the Ruiz residence to the minivan, and then the minivan drove off. The neighbor also mentioned something about a black or new Lexus. Brocchini's attempts to track down the person who actually made the statements were unsuccessful.

Meanwhile, according to Collins, he returned home sometime after dark on Sunday. He and his wife were relaxing when they heard a bang on the door. Nichols and Dean were there. Nichols said something to the effect that Trice had been shot crossing the street across from the gas station near Collins's house. They said they had dropped him off down the street at some girl's house. Dean said they could not leave their homeboy and asked how to get to the freeway. Collins gave him directions. Nichols, the more aggressive of the two, told Collins that they knew where he lived, and that if anyone came by asking questions, Collins was to say Trice got shot crossing the street. Collins could see the handle of a pistol tucked in the front of Nichols's pants. Nichols and Dean were at Collins's house for about 10 to 20 minutes, then left. Collins could not tell whether anyone else was in their car. While they were there, Helton telephoned with the news that Ruiz had been shot.

Helton telephoned Collins at about 9:00 p.m. He told Collins to call him if Collins heard anything. According to Helton, Collins called him back about 11:00 that night and said he had received several calls from people, advising him of Ruiz's death. Collins said nothing about anyone named Roach, Bam, or J Dogg.

Just after 9:00 p.m. on March 3, Atwater Police Officer Ridenour responded to an address in Atwater in response to a report of a shooting. He came in contact with a person who identified himself as Keith (not Kevin) Trice, and who had gunshot wounds to his back and lower abdomen.  Because there was no trauma center in Merced County, standard procedure was to airlift Trice to Modesto. When told this would happen, Trice immediately and adamantly responded that he did not want to go to Modesto.  Medical personnel explained that there were no other options.  Ridenour questioned Trice in the ambulance on the way to the airfield. Trice did not answer some of Ridenour's questions, although he did say that he did not know who shot him; that the person or persons were in a vehicle, but he did not know whether it was a car or a truck; and that he had been going to the store. Trice was similarly vague when questioned by a doctor at the hospital, adding little more than that he was from Los Angeles and had been down for three days, visiting a Sonjia in Atwater or Merced. Atwater police were unable to find any witnesses to a shooting or any physical evidence that one had occurred in the area.

Modesto Police Detectives Grogan and Blake interviewed Trice about 1:40 p.m. on March 4. Trice related that he had been in Atwater, visiting a friend named Sonjia Girtman, and was walking from her house to a store to purchase some alcohol, when he was the victim of a drive-by shooting. He said the car was dark and that he believed he was shot by someone sitting in the front passenger seat. Trice said he was bleeding profusely, and it took him some time to gather the strength to walk back to the apartment.

During the interview, Trice asked if he could use one of the detectives' phones to call his mother. After the interview ended, Blake allowed him to use his cell phone. Once he got connected, Trice said, "Mom, I got shot yesterday in Modesto." This was said as one complete sentence, without any gaps, although Grogan could not hear what, if anything, Trice's mother

said or asked.  Grogan subsequently obtained items of evidence from the Atwater Police Department and Sonjia Girtman's house, including an expired driver's license for Keith Lamont Trice (Trice's twin brother) and a pair of brown pants that had Trice's blood on them. He measured the distance and travel time between the crime scene in Modesto and Girtman's residence in Atwater, and determined it was possible for Trice to have left the scene in Modesto and gone to the address in Atwater between the homicide and when he placed the call for assistance.

Brocchini was assigned to research Trice. After talking to Trice's girlfriend and family, Brocchini put together a list of associates who matched the description of the suspects. He had photographic lineups made of those people, as well as Trice, and gave them to Detective Blake. Upon learning from Blake that the names Brocchini gave him were not identified, Brocchini continued to investigate and came up with Nichols as a possible suspect. He put together a photographic lineup of Nichols and gave it to Blake and Detective Owen.

Brocchini telephoned Collins the morning after the shooting. He was aware that Collins knew Ruiz and was working for Helton and the FBI. He wanted to know if Collins knew Trice, since Collins lived in Atwater and Trice had been found there. When Brocchini asked whether Collins knew Trice, to whom Brocchini referred by that name, Collins said no. However, Collins contacted Helton later that morning and told him that he thought something was going on.  As a result, Helton and Hammond interviewed him that afternoon. Collins provided descriptions of Bam, Roach, and J Dogg.  He said they had told him they had $5,000 and wanted to buy a quarter kilo, and that they would give him $500 to set up the buy. He later identified pictures of appellants and Blueford from photographic lineups.

Brocchini spoke to T. the afternoon after the shooting. When he asked if it was possible Ruiz had gone to meet somebody at the AM/PM minimart for the purpose of selling drugs, she said yes and agreed that whomever Ruiz spoke to in his last cell phone call could have had something to do with the incident. The caller log for Ruiz's cell phone showed that at 7:47 p.m. on the night of his death, he received a call from a cell phone associated with Dupree Hull, a Blood gang member who had been to prison. The last call Ruiz received, which was made at 7:59 p.m. that night, was from a cell phone associated with Thomas "Bird" White, another Blood member in Modesto, who dealt cocaine and had also been to prison. Brocchini asked around about their possible involvement; the only information he was able to obtain was that the last couple of phone calls to Ruiz were from phones associated with them.

On March 5, Brocchini contacted a parole agent working for a fugitive task force in Los Angeles and directed him to find and arrest Nichols. Nichols was arrested that day in Pasadena. A black beanie was seized in a search of his house. The next day, Brocchini contacted Officer Roldan of the Pasadena Police Department, who was known to him as an expert in the Black criminal street gangs of Pasadena, and asked for help in identifying J Dogg and B Dogg. Brocchini got these names from Collins, who said that Bam Bam, B Dogg, J Dogg, and Roach had come by.  Roldan researched J Dogg, and obtained enough information through an anonymous telephone call to figure out who this person was. As a result, Dean's photograph was obtained.  Roldan and Brocchini, who had gone to Pasadena on March 7, put together a photographic lineup and e-mailed it to Detective Blake in Modesto. Half an hour later, Blake informed Brocchini that T. and R. had identified Dean as a suspect.  As a result, Dean was arrested at his home.

After Dean's arrest, Brocchini continued his search for the Lincoln Town Car.  Following receipt of a tip, he went to a Budget Rent–A–Car place and learned that a car rented to Tricia Lee was at a rental yard at the airport in Burbank. He went to the airport and saw what looked like blood in the car's back seat. Brocchini had the car impounded and processed for evidence. Trice's blood was in the back seat. Nichols's palm print was found on the driver's side hood.

Tricia Lee rented the Lincoln on a Friday in February 2002, as her vehicle was scheduled to be serviced. Her plan was to rent the Lincoln for the weekend and return it on Monday. Trice was with her when she rented the car. Lee ended up not taking her car to get serviced, and at some point on Friday, Trice asked to use the Lincoln. He was going to come back during the weekend. When Lee got off work that Friday, she went to Trice's mother's house in Altadena. The car was still there. Trice had her permission to use it Saturday.  The next day, Lee attended a birthday party for Trice's nephew.  She expected to see Trice there at some point, but did not. She unsuccessfully tried to page him during the weekend to remind him that the car needed to be back on Monday.  On Monday morning, she received a call from Blueford, saying he had the rental car and so she could take it back and return it.  She asked where Trice was, but he said he did not know.

On March 14, Brocchini listened to some telephone calls at the Stanislaus County jail.  In one, Dean told his mother and sister to contact a lady he identified as JP's sister, and for whom he gave a telephone number. He wanted his mother and sister to make sure the lady said that Dean was dropped off at her house on Friday and was not picked up until after the weekend. As a result of information contained in the call, Brocchini contacted Lisa Young.

Young testified that Dean telephoned her on the Friday of the weekend of the homicide. Dean said he was in Modesto and wanted to visit her. She explained that she was going to be going out of town and would not be back until Sunday. At the time, Young lived in Fresno. Dean had visited her before and had brought Trice with him. She did not see Dean on the weekend of the homicide. Later, after Young had spoken to Brocchini and declined to say whether Dean had been with her, Dean's sister telephoned Young and said there was a message from Dean that he wanted Young to say he was with her that weekend.

On November 24, 2002, Herbert Brownlee, who lived on Walker Avenue approximately half a mile north of Woodland, reported finding a Lorcin .380 semiautomatic handgun underneath the empty engine compartment of a Mustang that he was preparing to take to the junkyard. The Mustang had been in a field next to Brownlee's house for months. The gun, which was rusted, had an empty clip in it and a live round in the chamber. At trial, T. identified this gun as being similar to the one Dean had.

Ruiz was shot at least nine times and sustained five fatal wounds. Stippling indicated that at least two of the shots were fired from close range. Death resulted from shock and hemorrhage due to multiple gunshot wounds. Four .22–caliber bullets from rimfire cartridges were recovered from his body during the autopsy. Although there was insufficient individual detail to definitively identify them as having been fired from the same gun, test firing showed that they could have been fired from the High Standard revolver recovered in this case. The nine-millimeter cartridge case found in the closet was fired by the Taurus nine-millimeter pistol. That pistol would not shoot a .40–caliber bullet; as the bullet would be too big for the chamber, the gun would not load itself and would jam. A nine-millimeter and .40–caliber cartridge are readily distinguishable because of their different diameters and weights. The condition of the Lorcin .380–caliber semiautomatic pistol was consistent with it being outside in a field for six to eight months or more, and the chamber and barrel were very corroded. The pistol was rusted shut, and a CCI-brand live round had to be forcibly removed from the chamber. This unfired round was the same caliber, and from the same manufacturer, as an expended cartridge from the homicide scene that was submitted for comparison, but results were inconclusive as to whether the expended cartridge had been fired from the Lorcin.

Gang Evidence

One of the items seized in a parole search of Nichols's house at the time of his arrest was a red baseball cap with a P on it in three different places. A probation search of Dean's residence that was conducted when Dean was arrested revealed a letter in his bedroom that was addressed to J

Dogg, and which was from a PDL Blood in prison. An April 1, 2002, search of the jail cell in which Dean and Nichols were housed turned up several items on which were symbols and writing referencing Denver Lane.

Pasadena Police Officer Okamoto testified as an expert on gangs, specifically PDL. He explained that PDL is a large gang that "pretty much controls all of Pasadena." He had also gotten calls concerning PDL involvement in criminal activity in a number of areas outside Pasadena. Okamoto described PDL as very violent and involved with numerous types of criminal activity. In his opinion, PDL is a criminal street gang as defined by the Penal Code. Its primary activities are theft, robbery, drug sales, carjacking, assaults, and murder. In March 2002, PDL had at least 50 members.

Okamoto explained that there are two sets of African–American gangs: the Crips and the Bloods. Although there are numerous different gangs within those two, all are either a Crip set or a Blood set. Crips and Bloods are rivals. Bloods' predominant favorite color is red; Crips' is blue. PDL is a Blood set. Their main rivals are the Altadena Block Crips and the Raymond Avenue Crips. PDL members often wear a Philadelphia Phillies hat, which is red with a white P on the front. The hat seized in the search of Nichols's residence would signify someone wearing gang attire, and "obviously" would be the hat of someone who was representing Pasadena.

In addition to colors, gang members use hand signals to identify each other. PDL members will make a P, an L, and a D with their hands, or, if they happen to see a rival as they drive by, they may throw up a quick L to signify they are from PDL. Tattoos show fellow gang members that a person is really involved with gang activity. Common tattoos are PDL, WSB for West Side Blood, DLB for Denver Lane Blood, or DL. A Blood may also have a CK tattoo, which stands for Crip Killer. In their graffiti, they will sometimes cross out the letter A so as to disrespect Altadena Block Crips. If someone passes away, they will not use the R in rest in peace, because that would be representing Raymond Avenue Crips. Instead, they will put BIP for Blood in Peace. Blood members also often call each other "Blood," both orally or in writing, or will call each other by a moniker or "homey."

In Okamoto's experience, when gang members commit crimes with other people, they normally commit those crimes with fellow gang members they can trust. They will not take an associate or someone who will be a weak link if arrested. A lot of PDL's activity is based on some type of monetary gain, as well as respect and intimidation.

Based on his review of a variety of materials, Okamoto concluded that Nichols, Trice, Dean, and Blueford were PDL members. He further opined that they were active PDL criminal street gang members on March 3, 2002. In Okamoto's opinion, appellants and Blueford willfully promoted, furthered, or assisted felonious criminal conduct by members of the gang by the actions alleged to have occurred in this case. The bragging rights they would bring back to Pasadena would garner them a large amount of respect from their fellow gang members, and would also bring a lot of respect to the gang. It was Okamoto's further opinion that each of the four actively participated in a criminal street gang with knowledge that its members engaged in a pattern of gang activity. His opinion was based on the intimidation factor they would bring back into the neighborhood. Whatever they would recover, such as narcotics, they would bring back into Pasadena and sell for some type of monetary gain, and then they could purchase more weapons, which would help them in more criminal activity. Furthermore, the crimes alleged were committed at the direction of or in association with a criminal street gang. All four individuals were active PDL gang members, and would not want to take an associate or someone they could not trust, so when recruiting in a case like this, they would definitely recruit fellow gang members.

10

Brocchini also testified as an expert in criminal street gangs, and expressed opinions, and bases therefor, that were consistent with those expressed by Okamoto. In addition, Brocchini explained that Crips call each other "Cuz," while Bloods call each other "Dogg." Nichols had several tattoos. One was "Lanes" with an X through the A, which was a sign of disrespect to the Altadena Block Crips. Another of Nichols's tattoos was "God Forgive, Lanes Don't." Trice had "Pasadena" tattooed across his back, with "D" on the back of his left arm and "L" on the back of his right arm. He also had "BIP" ("Blood in Peace") on an arm. Dean had no tattoos. However, Brocchini reviewed records for the cell phone attributed to Dean. He found calls made between February 25 and March 4, 2002, to the phone of Trice's girlfriend, Trice's pager, and Blueford's phone.

Brocchini was aware that Ruiz was a criminal street gang member. In his experience, gang members rob other gang members, because if someone breaks into a gang member's house, that person will find drugs, guns, or money. In addition, gang members usually do not report robberies, but instead try to get their belongings back on their own.

## II. Defense Evidence

### The Homicide and Investigation

Greg Albiani, a teacher, lived across the street from the Ruiz family at the time of the shooting. He observed goings-on at the residence that he believed were consistent with drug activities. There was repeated car traffic, in which one or two people would drive up to the house, open the trunk of the car, pull out a shopping bag or something of that nature that did not appear to have anything in it, go into the house, and then come back out within five to 10 minutes with the same bag, place the bag back in the trunk, and then leave. Several times on different days, he saw a black Lexus in the area. One day, it drove up at least two or three times. It would come up and turn around and leave. Typically, there were two occupants in the car. Albiani also saw evidence of gang attire, such as khaki pants, white shirts, shaved heads, tattoos, baggy pants, and the like. Albiani contacted the police department and was informed they knew what was going on.

Shortly after the homicide, Albiani gave Detective Buehler a list of vehicles and license plate numbers that he suspected were involved in the activities he had seen at the Ruiz house. Buehler did not check the license plate numbers Albiani provided, and could not recall if he asked anybody else to do so.

At approximately 8:15 or 8:20 p.m. on March 3, 2002, James Norris was in a park located several blocks south of both Woodland Avenue and Montilla Lane. Norris saw a male in a black hooded sweatshirt, running south along the park. He was running very fast and kept turning around and looking back, as if maybe someone was after him. This person met up with two other individuals at the south end of the park. They talked for 30 seconds to a minute, then ran father south. An officer was patrolling the area and asked if Norris had seen anyone. Norris reported what he had seen.

Modesto Police Officer Wilcoxson was one of the first responders to the Ruiz residence following the shooting. He spoke briefly to T., who was hysterical. He also interviewed R. She said she saw four or five Black males come through the garage door and force their way into the house. She described one as being approximately 20 to 30 years old, about five feet 10 inches, tall and thin, and wearing a black beanie on his head, as well as a long-sleeved black shirt and black baggy jeans. She was unable to give any other descriptions.

Modesto Police Officer Sanchez was involved in securing the homicide scene. In the exterior lock of the front door was a set of keys that appeared to have blood on them.

11

Detective Owen interviewed T. on March 4 and showed her two photographic lineups. One included Nichols's picture. T. said that the skin tones of the suspect were lighter than those in the pictures. After Owen asked whether any of the photographs looked similar aside from the skin tones, T. focused on the photograph of Nichols. She said the facial features were very similar, and she eliminated all the other photographs. She said she wanted to see the individual in person. She wanted to see the total body because there were parts of his body she felt she could identify. She said the suspect had a fat gut and fat sides and his stomach jiggled. After looking at the second photographic lineup, T. said none of the people looked familiar. Owen noted, however, that she looked at Trice's picture several times. When Owen asked why, she said the complexion, forehead, and hairline were the same, but she was not sure and wanted to see the man in person. T. said she could eliminate two of the photographs, but not the others. On March 12, Detective Blake showed two photographic lineups to T., one of which contained Blueford's picture. T. did not see anyone she recognized, although she pointed to one she said resembled one of the suspects. The photograph was of someone other than Blueford.

Dr. Mitchell Eisen, a psychologist who testified concerning eyewitness memory and suggestibility, explained that research shows people are better in general at making identifications within their own race than they are cross-race. Cross-racial groups tend to have higher rates of false identifications than same-race groups. Research also shows that the younger the child, the more suggestible, because the more the child tends to rely on adults for cues as to what the adult is after and what really happened. Children are not as skillful as adults in organizing information so that it can be recalled on demand. Children are particularly influenced by their parents.

W. Jerry Chisum, a crime scene reconstructionist, examined photographs, crime scene videos, and other materials in connection with this case. Based on his review of the evidence, he concluded Ruiz was shot in the bedroom itself, not in the closet. He reached this conclusion because there was no blood documented in the closet. There was, however, blood spatter in the bedroom itself. If someone other than Ruiz—for example, Trice—was shot inside the house and sustained a through-and-through wound, there would have been a bullet and some blood, which would have contained DNA. Chisum conceded that he could not exclude blood being in the closet; it could have been too small a spot to observe, or there could have been blood evidence that was not documented. He also conceded it was possible for someone to get shot and not have blood recovered from the location at which he or she was shot. Someone could be shot and have internal, as opposed to external, bleeding; moreover, it was possible that clothing could catch external bleeding and prevent the blood from landing on the ground.

The jamming of the nine-millimeter pistol indicated to Chisum that someone had removed a nine-millimeter cartridge from the magazine and inserted a .40–caliber cartridge in its place. When the gun was fired once, the larger-caliber cartridge moved up, would not chamber properly, and jammed the weapon. In the photographs Chisum reviewed, the box of .40–caliber cartridges appeared to be closed. Chisum would have asked to have the weapon's magazine and the cartridges fingerprinted, particularly the .40–caliber cartridge causing the jam, the nine-millimeter shell that was in the box, and the box itself. No physical evidence Chisum saw showed Ruiz had the nine-millimeter pistol in his hand or fired it. As for the shots fired through the closet door, the powder was still present. None of the physical evidence indicated when the shots were fired, however. They could have been fired an hour or even two days before the police arrived.

Chisum reviewed photographs of the bathroom window area. He did not believe they were consistent with someone going through that window, because of the way the window's screen was dislodged and the lack of damage to the bush, and absence of footprints in the soil, below the window. The lawn appeared to be about two feet from the window, however. It was possible that if someone landed on the grass and a photograph was taken several hours later, there might be no evidence of the landing.

12

Trice testified that in the latter part of February 2002, his girlfriend, Tricia Lee, was going to have her car in the shop for a couple of days. As a result, the two of them went to the rent-a-car place and she rented a Lincoln Town Car. He believed this took place on Thursday, February 28.

As Lee had to return to work, Trice drove the Lincoln to Altadena, where he was living with his parents. A couple of hours later, at around 2:00 p.m., he drove it to the house of Bobby Blueford's girlfriend. Trice had grown up with Blueford and Dean, and he and Blueford sat and talked for a while. Trice told Blueford that he felt like going to Madera to visit some lady friends. He also had family there, as well as in Merced. Trice had been wanting to visit for some time, and felt that since he had the car, he might as well go. He also wanted to see if he could buy some cocaine. He invited Blueford to go with him, so Blueford said to pick him up later. The plan was just to hang out and party with some people Trice knew, and to get away from the Los Angeles scene for a little while.

After leaving Blueford's house, Trice went to Dean's residence to see if he wanted to go to Madera. Dean said he would let Trice know, so then Trice went to Nichols's house. Trice had known Nichols for nine or 10 years. When Trice said he was going up north, Nichols agreed to go, as he wanted to visit his young son in Madera.

Trice had more than one source of cocaine, although he usually dealt with his uncle, Bernard. Phil Collins was not a definite source at the time, although Trice knew he had sold drugs in the past. Trice associated with Collins when Trice was selling drugs in Merced. Trice telephoned a lady friend, Shawana, and told her he would be up in Madera. He also might have called Collins sometime during the day. He tried unsuccessfully to contact Bernard; he had around $5,000 and wanted to buy a quarter kilo of cocaine.

Around 8:00 that night, Trice picked up Nichols and Blueford. They went to a liquor store to get things they would need for the trip, then went to Dean's house. Dean had decided to go, but chose to ride his motorcycle. After he got his things, the group went to a gas station. Trice, Blueford, and Nichols were in the Lincoln, with Trice driving. At the gas station, Trice made some telephone calls, then they headed north. Nichols was now driving, and those in the car were drinking and smoking marijuana. While going over the Grapevine, Trice started coughing hard, and then his nose started to bleed. The group stopped at a gas station so he could clean himself up, as he had blood on him.

The group finally arrived in Madera. When Trice was unable to locate Bernard, they went to Shawana's house. Trice dropped Nichols at his son's mother's house on the way, then Trice, Blueford, and Dean spent the night at Shawana's residence.

The next morning, Friday, March 1, appellants and Blueford headed to Collins's house in Atwater. Trice and Blueford had been in prison with Collins. Collins was home, and everyone ended up in his back yard, socializing. After a while, Trice told Collins why he was there, and that he wanted to buy a quarter kilo. Collins said he had a connection and could hook it up, and that he would check on it and Trice should get back to him. Collins's attitude toward the whole thing was nonchalant. Nothing was said about what he would get out of it, but Trice's understanding was that the middleman would either take something out of the money or would get something from the dealer. The price discussed with Collins for the quarter kilo was $4,500.

Appellants spent a couple of hours at Collins's house, then headed to Merced. Dean was in the car with them this time. Trice was trying to catch up to Bernard as another possible source of drugs, but could not locate him. The group then returned to Shawana's house in Madera. After an hour or so, Trice left by himself to look for Bernard. While looking, he ran into a friend of his who tried to hook him up to get some cocaine. Trice learned there would be a party that

night, and he returned to Shawana's house to get the others. They partied for a while at a house in Madera, then Trice took Dean and a woman Dean met at the party back to Shawana's house so Dean could get his motorcycle. Dean said he was going to the woman's house, and Trice returned to the party, where Nichols and Blueford were. They stayed at the party until late, then Trice dropped Nichols off at the home of his son's mother, and Trice and Blueford returned to Shawana's house. Trice did not hear anything from Dean after Dean got his motorcycle.

The next morning, Trice told Blueford to take the car back to Lee, as he knew she would need it that day. Blueford agreed. Trice was not going back, but instead was still trying to get some cocaine. Trice went to pick up Nichols and told him what was planned, then took him back to Shawana's house. Trice then left to gas up the car and try again to find Bernard. He found him at the home of the mother of Bernard's child. The couple was arguing, so Trice and Bernard got in the Lincoln and rode around for a while. Trice asked about cocaine and Bernard said he would hook him up, but Trice could tell he was not really into it. Trice asked when he would be heading back to Merced, where he lived, and Bernard said it would be that afternoon. Trice told him to pick him up at Shawana's house, and Bernard agreed. Trice then returned to Shawana's residence and gave the car keys to Blueford, and then Blueford and Nichols left.

Trice remained at Shawana's home, waiting for Bernard. When Bernard did not come, Trice telephoned the mother of Bernard's child and learned that Bernard had left. Trice then took the bus to Merced. He was still trying to catch up to Bernard, but, when he could not make telephone contact, he called Sonjia Girtman to come and pick up him, and the two went back to her house in Atwater. Girtman's residence was less than a mile from Collins's house.

Trice spent Saturday night with Girtman at her residence. The next day, they waited for one of her daughters, Tanisha, to arrive. They then socialized with Girtman's daughters and a friend. Later that evening, after the friend left, Trice told Girtman that he was going to the store. It was nighttime; he smoked a cigarette outside the residence, then gradually walked around the corner. He was not paying much attention, because the store was just down the street. He was walking with his head down and, although he noticed when a car pulled up, he thought nothing of it at the time. There were two people in the car; he thought they might be Hispanic. The passenger said something to him, but he did not catch what. He asked what was up, then saw the passenger pull out a gun. The man fired and Trice was hit.

Trice fell down and then crawled to a little grass area. He lost his strength and did not hear the car drive off. He did not know how long it took him to get up, but he gathered some strength and made it back to Girtman's residence. He was bleeding and in pain. He opened the door and fell in the doorway, then told Girtman to call the paramedics. Trice remembered Tanisha holding a towel to his back and him leaning over the couch. Trice felt very cold and was in a lot of pain and thought he was going to die. He had no idea what happened to his money. Trice denied giving his name as Kevin Trout or Keith Trice. The Atwater police took Keith's driver's license out of Trice's pants, where Keith had previously left it. Trice was not using it to pass himself off as Keith. As twins, it was not unusual for the brothers to wear each other's clothes.

## Gang Evidence

Timothy Rhambo, who was a youth counselor for a group home for foster children in Pasadena and also a boxing coach for children in the community, was involved with PDL in the late 1980's. In the 1990's and early 2000's, he got to know Nichols quite well. Nichols helped him a lot. They tried to organize a few things in the neighborhood to get people together to stop the violence, such as a football game between the youngsters and the OG's. This was in 2000 or 2001. Nichols was one of the main organizers. There was a lot of Blood–against–Blood violence going on, with young PDL members against older PDL members, and the point of the

14

event was to show that they did not need to be violent toward each other. Nichols's involvement brought credibility to Rhambo and what he was trying to do, as Nichols was more known as a gang member.

It is easy to get out of PDL; a person simply stops being "with that" and associating with the people he was associating with before and starts doing his own thing, whatever it is. Rhambo was seeing this from Nichols during the summer of 2001, although Nichols had been in and out of jail a lot and had had a reputation as being a hardcore gang member. Rhambo was also acquainted with Trice, with whom he had gone to school. In the late 1990's, Trice no longer dressed like he had in the early 1980's, when he was a PDL member. Rhambo had also seen Dean before, and thought he was "probably" an active gang member "back in the day," although he did not know. He could not remember where or in what context he had seen Dean.

(LD 4, pp. 3-31).

## DISCUSSION

### I.   Jurisdiction

Relief by way of a petition for writ of habeas corpus extends to a person in custody pursuant to the judgment of a state court if the custody is in violation of the Constitution, laws, or treaties of the United States.  28 U.S.C. § 2254(a); 28 U.S.C. § 2241(c)(3);  Williams v. Taylor, 529 U.S. 362, 375 n. 7 (2000).  Petitioner asserts that he suffered violations of his rights as guaranteed by the United States Constitution.  The challenged conviction arises out of the Stanislaus County Superior Court, which is located within the jurisdiction of this court.  28 U.S.C. § 2254(a); 28 U.S.C.§ 2241(d).

On April 24, 1996, Congress enacted the Antiterrorism and Effective Death Penalty Act of 1996 ("AEDPA"), which applies to all petitions for writ of habeas corpus filed after its enactment. Lindh v. Murphy, 521 U.S. 320 (1997), cert. denied, 522 U.S. 1008, 118 S.Ct. 586 (1997);  Jeffries v. Wood, 114 F.3d 1484, 1500 (9th Cir. 1997), cert. denied, 520 U.S. 1107 (1997), overruled on other grounds by Lindh v. Murphy, 521 U.S. 320 (holding the AEDPA only applicable to cases filed after statute's enactment).  The instant petition was filed after the enactment of the AEDPA and is therefore governed by its provisions.

### II.   Legal Standard of Review

A petition for writ of habeas corpus under 28 U.S.C. § 2254(d) will not be granted unless he can show that the state court's adjudication of his claim:

(1)   resulted in a decision that was contrary to, or involved an unreasonable application of, clearly established Federal law, as determined by the Supreme Court of the United States; or

(2)  resulted in a decision that "was based on an unreasonable determination of the facts in light of the evidence presented in the State court proceeding.

28 U.S.C. § 2254(d); Lockyer v. Andrade, 538 U.S. 63, 70-71 (2003); Williams, 529 U.S. at 412-413.

A state court decision is "contrary to" clearly established federal law "if it applies a rule that contradicts the governing law set forth in [the Supreme Court's] cases, or "if it confronts a set of facts that is materially indistinguishable from a [Supreme Court] decision but reaches a different result." Brown v. Payton, 544 U.S. 133, 141 (2005), citing Williams, 529 U.S. at 405-406.  A state court decision involves an "unreasonable application" of clearly established federal law "if the state court applies [the Supreme Court's precedents] to the facts in an objectively unreasonable manner."  Id., quoting Williams, 529 U.S. at 409-410; Woodford v. Visciotti, 537 U.S. 19, 24-25 (2002)(per curiam).

Consequently, a federal court may not grant habeas relief simply because the state court's decision is incorrect or erroneous; the state court's decision must also be objectively unreasonable. Wiggins v. Smith, 539 U.S. 510, 511 (2003) (citing Williams, 529 U.S. at 409).  In Harrington v. Richter, 562 U.S. ___ , 131 S.Ct. 770 (2011), the U.S. Supreme Court explained that an "unreasonable application" of federal law is an objective test that turns on "whether it is possible that fairminded jurists could disagree" that the state court decision meets the standards set forth in the AEDPA.  If fairminded jurists could so disagree, habeas relief is precluded.  Richter, 131 S.Ct. at 786.  As the United States Supreme Court has noted, AEDPA's standard of "contrary to, or involv[ing] an unreasonable application of, clearly established Federal law" is "difficult to meet," because the purpose of AEDPA is to ensure that federal habeas relief functions as a "'guard against extreme malfunctions in the state criminal justice systems,'" and not as a means of error correction.  Richter, 131 S.Ct. at 786, quoting Jackson v. Virginia, 443 U.S. 307, 332, 99 S.Ct. 2781, n. 5 (1979)(Stevens, J., concurring in judgment).  The Supreme Court "said time and again that 'an unreasonable application of federal law is different from an incorrect application of federal law.'" Cullen v. Pinholster, 131 S.Ct. 1388, 1410-1411 (2011).  Thus, a state prisoner seeking a writ of habeas corpus from a federal court "must show that the state court's ruling on the claim being presented in federal court was so lacking in justification that there was an error well understood and comprehended in existing law beyond any possibility of fairminded disagreement."  Richter, 131 S.Ct. at 787-88. Put another way, a state court's determination

16

that a claim lacks merit bars federal habeas relief so long as "fairminded jurists could disagree" on the

state court's decision.  Yarborough v. Alvarado, 541 U.S. 652, 664 (2004).

Moreover, federal "review under § 2254(d)(1) is limited to the record that was before the state

court that adjudicated the claim on the merits."   Cullen, 131 S.Ct. at 1398 ("This backward-looking

language requires an examination of the state-court decision at the time it was made.  It follows that

the record under review is limited to the record in existence at the same time–i.e., the record before the

state court.")

The second prong of federal habeas review involves the "unreasonable determination" clause of

28 U.S.C. § 2254(d)(2).  This prong pertains to state court decisions based on factual findings.  Davis v.

Woodford, 384 F.3d at 637, citing Miller-El v. Cockrell, 537 U.S. 322 (2003).  Under § 2254(d)(2), a

federal court may grant habeas relief if a state court's adjudication of the petitioner's claims "resulted

in a decision that was based on an unreasonable determination of the facts in light of the evidence

presented in the State court proceeding."  Wiggins, 539 U.S. at 520; Jeffries, 114 F.3d at 1500 (when

reviewing a state court's factual determinations, a "responsible, thoughtful answer reached after a full

opportunity to litigate is adequate to support the judgment").  A state court's factual finding is

unreasonable when it is "so clearly incorrect that it would not be debatable among reasonable jurists."

Id. ; see Taylor v. Maddox, 366 F.3d 992, 999-1001 (9th Cir. 2004), cert.denied, Maddox v. Taylor,

543 U.S. 1038 (2004).

The AEDPA also requires considerable deference be given to a state court's factual findings.

"Factual determinations by state courts are presumed correct absent clear and convincing evidence to

the contrary, § 2254(e)(1), and a decision adjudicated on the merits in a state court and based on a

factual determination will not be overturned on factual grounds unless objectively unreasonable in light

of the evidence presented in the state court proceedings, § 2254(d)(2)."  Miller-El v. Cockrell, 537 U.S.

at 340.  Both subsections (d)(2) and (e)(1) of § 2254 apply to findings of historical or pure fact, not

mixed questions of fact and law.  See Lambert v. Blodgett, 393 F.3d 943, 976-077 (2004).

To determine whether habeas relief is available under § 2254(d), the federal court looks to the

last reasoned state court decision as the basis of the state court's decision.  See Ylst v. Nunnemaker,

501 U.S. 979, 803 (1991); Robinson v. Ignacio, 360 F.3d 1044, 1055 (9th Cir. 2004).  Where the state

court decided the petitioner's claims on the merits but provided no reasoning for its decision, the federal habeas court conducts "an independent review of the record...to determine whether the state court [was objectively unreasonable] in its application of controlling federal law."   Delgado v. Lewis, 223 F.3d 976, 982 (9th Cir. 2002); see Himes v. Thompson, 336 F.3d 848, 853 (9th Cir. 2003). "[A]lthough we independently review the record, we still defer to the state court's ultimate decisions." Pirtle v. Morgan, 313 F.3d 1160, 1167 (9th Cir. 2002).   Where the state court denied the petitioner's claims on procedural grounds or did not decide such claims on the merits, the deferential standard of the AEDPA do not apply and the federal court must review the petitioner's 's claims de novo.  Pirtle v. Morgan, 313 F.3d at 1167.

The prejudicial impact of any constitutional error is assessed by asking whether the error had "a substantial and injurious effect or influence in determining the jury's verdict."  Brecht v. Abrahamson, 507 U.S. 619, 623 (1993); see also Fry v. Pliler, 551 U.S. 112, 119-120 (2007) (holding the Brecht standard applies whether or not the state court recognized the error and reviewed it for harmlessness). Some constitutional errors, however, do not require that the petitioner demonstrate prejudice.  See Arizona v. Fulminante, 499 U.S. 279, 310 (1991); United States v. Cronic, 466 U.S. 648, 659 (1984). Furthermore, where a habeas petition governed by the AEDPA alleges ineffective assistance of counsel under Strickland v. Washington, 466 U.S. 668 (1984), the Strickland prejudice standard is applied and courts do not engage in a separate analysis applying the Brecht standard.  Avila v. Galaza, 297 F.3d 911, 918 n. 7 (9th Cir. 2002); Musladin v. Lamarque, 555 F.3d 830, 835 (9th Cir. 2009).

### III.    Review of Petitioner's Claims.

The instant petition itself alleges the following as grounds for relief: (1) the trial court erred in refusing to bifurcate the trial of the gang allegations from the substantive criminal charges; (2)  the identification procedures used to identify Petitioner were impermissibly suggestive; (3)  prosecutorial conduct in withholding material evidence; (4) the trial court erred in admitting the testimony of the pathologist; and (5) insufficient evidence was presented for the firearm enhancement.

A.  Refusal to Bifurcate Gang Evidence

Petitioner first contends that the trial court erred in refusing to bifurcate the trial of the gang allegations from the trial on the substantive criminal charges.  This contention is without merit.

18

1          1. <u>The 5th DCA's Opinion</u>.

The 5th DCA rejected Petitioner's claim as follows:

Appellants contend the trial court abused its discretion by refusing to bifurcate the gang allegations. We conclude reversal is not warranted.

1. Background

Brocchini was the prosecution's gang expert at the preliminary hearing, although he conceded that he had no expertise specifically in Southern California gangs. Ruiz was known to Brocchini to be a member of the West Side Boyz, a criminal street gang whose primary activity was selling drugs. In Brocchini's opinion, Ruiz was a shot-caller for the gang.

Brocchini related that, upon receiving anonymous information giving the names Bam and Nichols and that the person was from Pasadena, he contacted Roger Roldan, a gang expert for the Pasadena Police Department. Roldan identified Nichols as Bam. Brocchini also gave Roldan the name J Dogg, which he got from Phil Collins, and asked Roldan to help put together a photographic lineup. Brocchini contacted Agent Mandenlian, a parole agent on the fugitive task force, and informed him of the situation. Mandenlian said he would arrest Nichols for Brocchini. Brocchini then went to Pasadena and, Roldan having figured out J Dogg's identity, a photographic lineup containing Dean's picture was put together. This was transmitted to Detective Blake, who obtained a positive identification of Dean as one of the perpetrators.

After getting anonymous information that the perpetrators were Pasadena Denver Lane Blood members, Brocchini spoke to Roldan and Mandenlian about that gang, and also researched it through the Cal Gang Network, a system that allows agencies throughout California to input information about gangs. He spoke to Nichols's parole officer and learned that Nichols had identified himself as a PDL member. He also spoke to Carla Galbreath when he was looking for Dean; she said she associated with PDL members, and identified Dean and Trice as PDL members. Brocchini also spoke with Trisha Lee, Trice's girlfriend. She stated that Trice had been a PDL member for as long as she had known him, and that she gave him money each month so that he did not have to commit crimes with other gang members.

Based on information he obtained, Brocchini opined that PDL was a criminal street gang as of the date of the Ruiz homicide, and that appellants were PDL members. He further opined that the primary activities of PDL were selling narcotics, assault with firearms, robbery, and murder. With respect to the present case, Brocchini opined that the crimes were committed for the benefit of PDL. He based his opinion on experience talking with gang members; the only way they can gain weapons is by stealing them, and any other stolen property, such as cocaine, they could sell in their own territory to make money, which would benefit the gang. The fact the perpetrators came into town unmasked and armed, then committed a violent act in another town, would benefit PDL's reputation. Brocchini conceded that, in order to create the perception in people's minds that a gang is expanding its sphere of influence and is to be feared, the gang members would have to identify themselves as belonging to that particular gang so people will know who committed the crime. He was unaware of anything in the facts of the present case in which any of the participants identified themselves as gang members to the victims.

At the conclusion of the preliminary hearing, the magistrate found "strong evidence" to sustain the gang enhancement allegations. Appellants were held to answer accordingly.

Prior to trial, appellants moved to have the gang enhancement allegations bifurcated, on the ground the gang evidence would have a prejudicial effect and would deprive them of due

process and a fair trial. The People opposed the motion, arguing bifurcation was unwarranted because the gang enhancements were inextricably intertwined with the charged offenses and evidence of appellants' gang activities and membership was important to demonstrate their motive for the robbery. The trial court denied the motion.

In ruling on appellants' motions for new trial, the trial court found various problems with respect to the gang testimony. In light of these problems, which included the fact that "there was plentiful evidence of gang membership, but scant evidence of gang benefit," the court ordered the jury's true findings on the section 186.22, subdivision (b) enhancements stricken as to each count.

2. Analysis

In People v. Hernandez (2004) 33 Cal.4th 1040, the California Supreme Court held that a trial court has discretion to bifurcate trial on a gang enhancement. (Id. at p. 1049.) The court cautioned that bifurcation will sometimes be appropriate: "The predicate offenses offered to establish a 'pattern of criminal gang activity' (§ 186.22, subd. (e)) need not be related to the crime, or even the defendant, and evidence of such offenses may be unduly prejudicial, thus warranting bifurcation. Moreover, some of the other gang evidence, even as it relates to the defendant, may be so extraordinarily prejudicial, and of so little relevance to guilt, that it threatens to sway the jury to convict regardless of the defendant's actual guilt." (Hernandez, at p. 1049.)

In cases where a gang enhancement has not been alleged, the state high court has "held that evidence of gang membership is potentially prejudicial and should not be admitted if its probative value is minimal. [Citation.] But evidence of gang membership is often relevant to, and admissible regarding, the charged offense. Evidence of the defendant's gang affiliation— including evidence of the gang's territory, membership, signs, symbols, beliefs and practices, criminal enterprises, rivalries, and the like—can help prove identity, motive, modus operandi, specific intent, means of applying force or fear, or other issues pertinent to guilt of the charged crime. [Citations.] To the extent the evidence supporting the gang enhancement would be admissible at a trial of guilt, any inference of prejudice would be dispelled, and bifurcation would not be necessary. [Citation.] [¶] Even if some of the evidence offered to prove the gang enhancement would be inadmissible at a trial of the substantive crime itself—for example, if some of it might be excluded under Evidence Code section 352 as unduly prejudicial when no gang enhancement is charged—a court may still deny bifurcation." (People v. Hernandez, supra, 33 Cal.4th at pp. 1049–1050.) In sum, "the trial court's discretion to deny bifurcation of a charged gang enhancement is ... broader than its discretion to admit gang evidence when the gang enhancement is not charged. [Citation.]" (Id. at p. 1050.)

Gang evidence has an inherent potential for prejudice; it "creates a risk that the jury will infer that the defendant has a criminal disposition and is therefore guilty of the charged offense...." (People v. Samaniego, supra, 172 Cal.App.4th at p. 1167.) Yet, an allegation under section 186.22, subdivision (b) is a separate enhancement allegation, not a substantive crime. The extent to which a crime is committed to benefit a gang does not bear, in and of itself, on the issue of guilt or innocence of the underlying offense. Similarly, whether a defendant belongs to a gang does not prove guilt. "Nonetheless, evidence related to gang membership is not insulated from the general rule that all relevant evidence is admissible if it is relevant to a material issue in the case other than character, is not more prejudicial than probative, and is not cumulative. [Citations.]" (People v. Samaniego, supra, 172 Cal.App.4th at p. 1167.)

In our view, because of the potential for prejudice inherent in gang evidence, absent some showing the gang evidence is probative as it pertains to the issue of guilt of the underlying crime, failure to bifurcate is necessarily error. If the gang evidence (whether it be the defendant's association with a gang or some other aspect) is not at least minimally probative

with respect to a charged offense, bifurcation should be granted. There must be something more than guilt by association or propensity.

The basic issues thus are relevance and prejudice, and they are inextricably intertwined. Questions the trial court should consider in determining the need for bifurcation include: Does anything about the crime reasonably suggest gang involvement or motive, even without a gang expert's interpretation? If the gang enhancement allegations were to be bifurcated, would at least some gang-related evidence likely be admitted in the trial of the substantive offense(s) anyway? If bifurcation is not ordered, what kind of evidence is likely to be admitted in support of the gang enhancements that is not probative of the charged crimes themselves, and how potentially inflammatory will that evidence likely be? For example, will evidence of the predicate acts or pattern of criminal gang activity involve crimes of violence much greater than any involved in the charged offenses, such that the jury will be likely to use it as bad character evidence against the defendant(s)?

Turning to the case before us, "[w]e review the correctness of the trial court's ruling at the time it was made, ... and not by reference to evidence produced at a later date. [Citations.]" (People v. Welch (1999) 20 Cal.4th 701, 739; see People v. Turner (1984) 37 Cal.3d 302, 312 [addressing ruling on severance motion], overruled on other grounds in People v. Anderson (1987) 43 Cal.3d 1104, 1149.) Here, it was apparent from the evidence adduced at the preliminary hearing that, although there were no overt signs of gang involvement such as the flashing of signs or saying of a gang's name during commission of the charged offenses, some gang-related evidence would be admissible even in the event of bifurcation—for example, to explain how appellants were developed as suspects. There would also be evidence of more than one perpetrator acting in concert. The trial court reasonably could also have concluded the evidence related only to the gang enhancement allegations would not likely be more inflammatory than the facts of the charged offenses themselves. Under the circumstances, we cannot say the trial court's refusal to bifurcate "exceed[ed] the bounds of reason, all of the circumstances being considered. [Citations.]" (People v. Giminez (1975) 14 Cal.3d 68, 72.) Accordingly, the trial court acted within its discretion in denying the motions for bifurcation. (People v. Hernandez, supra, 33 Cal.4th at p. 1051.)

This does not end our inquiry, however, since, by analogy to the law concerning severance (see People v. Hernandez, supra, 33 Cal .4th at p. 1050), even if the ruling denying bifurcation was correct when made, "[a]fter trial, ... the reviewing court may nevertheless reverse a conviction where, because of the consolidation, a gross unfairness has occurred such as to deprive the defendant of a fair trial or due process of law. [Citation.]" (People v. Turner, supra, 37 Cal.3d at p. 313.) Appellants argue that admission of the gang evidence resulted in such a level of unfairness here, thus violating due process.

The record before us leaves no doubt that evidence came before the jury that was unnecessary and had a high potential for being inflammatory and prejudicing appellants. For instance, evidence of numerous criminal acts, committed or allegedly committed by appellants and other PDL members, was admitted to establish that PDL was a criminal street gang within the meaning of section 186.22, and that appellants were associated with the gang.[38] While we recognize that the prosecutor had to prove beyond a reasonable doubt that PDL was a criminal street gang since appellants apparently would not stipulate to that fact, PDL's status as such was never seriously contested. Thus, there was no need for the prosecutor to introduce evidence of numerous predicate acts simply because subdivision (e) of section 186.22 refers to two or more offenses. Prosecutors have no right to overprove their case or put on every bit of evidence they have (People v. Williams (2009) 170 Cal.App .4th 587, 610), and the prosecutor's tactics here verged on overkill. While we cannot fault the introduction of evidence supporting the testimony of Officer Okamoto concerning what constitute PDL's primary activities, there is a fine line between evidence that constitutes legitimate proof of statutory elements or that demonstrates the basis for an expert's testimony, and evidence that constitutes

illegitimate proof of guilt by association and bad character. It bears emphasizing that trial courts must be careful to use their powers under Evidence Code section 352 to limit the evidence to its proper purpose—establishing the existence of a criminal street gang—and not to permit a prosecutor, through the guise of establishing that fact, to seek to imply improperly to the jury that the gang is violent, therefore the defendant is violent, therefore the defendant likely committed the charged crime(s).

Despite the foregoing, we conclude that the erroneously admitted evidence was not, in light of all the circumstances and the record as a whole, so inflammatory and so lacking in probative value as to violate appellants' right to due process, even given the trial court's comments about the sufficiency of the evidence in its ruling on the motions for new trial.40 The trial court was clearly aware of, and exercised, its authority to exclude cumulative and inflammatory evidence. (See People v. Williams, supra, 170 Cal.App.4th at pp. 610–611.) The court also required the prosecutor to have Brocchini testify regarding different areas than Okamoto and not simply go over the same ground. Brocchini acknowledged that gang members can commit crimes that are not for the benefit of the gang, and he gave an example from personal experience of a gang member who had been selling drugs for his own benefit, an offense that (unlike the domestic violence example Brocchini also gave) would often be perceived as benefitting the gang. He also testified that it is not a crime simply to be a gang member.

Significantly, Ruiz was himself shown to be a senior member of a gang and a large-scale drug dealer who cooked his product in, and apparently conducted at least some of his business from, the house in which his children lived. This served to neutralize at least some of the inflammatory effect of the gang evidence. (See People v. Sandoval (1992) 4 Cal.4th 155, 173, affd. sub nom. Victor v. Nebraska (1994) 511 U.S. 1.) Also neutralizing were the circumstances of the charged offenses themselves—a callous, violent, home-invasion robbery and murder in the presence of young children who were lucky not to have been injured or killed themselves. Although some of the predicate acts were violent, so were the charged offenses. Additionally, in light of the total absence of physical evidence of a shooting in Atwater, admission of the gang evidence had little or no effect on Trice's account of events. (Contrast People v. Avitia (2005) 127 Cal.App.4th 185, 194–195.) Appellants' arguments to the contrary notwithstanding, evidence of their guilt was very strong, and the gang-violence evidence was not pervasive. (Contrast People v. Maestas (1993) 20 Cal.App.4th 1482, 1498.) Moreover, the trial court instructed the jury that it could consider the evidence of gang activity only for the limited purpose of deciding whether a defendant acted with the intent, purpose, and knowledge required to prove the gang-related crime and enhancement and special circumstance allegations that were charged, and it cautioned jurors that they could not conclude from the evidence that a defendant was a person of bad character or had a disposition to commit crimes. (See People v. Gutierrez (2009) 45 Cal.4th 789, 820.) "Jurors are routinely instructed to make ... fine distinctions concerning the purposes for which evidence may be considered.... [Citation.]" (People v. Yeoman (2003) 31 Cal.4th 93, 139.) Even where gang evidence is concerned, "[i]t is, of course, presumed the jury understood and followed the court's instruction in the absence of any showing to the contrary. [Citation.]" (People v. Williams, supra, 170 Cal.App.4th at p. 613.) The record contains no such showing here.

Appellants cite People v. Albarran (2007) 149 Cal.App.4th 214 (Albarran), in which the appellate court found that the admission of gang evidence violated due process and rendered the trial fundamentally unfair. (Id. at p. 232.) The court summarized the law applicable to a due process claim as follows: "To prove a deprivation of federal due process rights, [a defendant] must satisfy a high constitutional standard to show that the erroneous admission of evidence resulted in an unfair trial. 'Only if there are no permissible inferences the jury may draw from the evidence can its admission violate due process. Even then, the evidence must "be of such quality as necessarily prevents a fair trial." [Citation.] Only under such circumstances can it be inferred that the jury must have used the evidence for an improper purpose.' [Citation.] 'The dispositive issue is ... whether the trial court committed an error which rendered the trial "so

'arbitrary and fundamentally unfair' that it violated federal due process." [Citations.]' [Citation.]" (Id. at pp. 229–230, fn. omitted.)

With respect to the case before it, the court explained: "Certain gang evidence, namely the facts concerning the threat to police officers, the Mexican Mafia evidence and evidence identifying other gang members and their unrelated crimes, had no legitimate purpose in this trial. The trial court's ruling on the new trial motion in which it broadly concluded the gang evidence was admissible to prove motive and intent for the underlying charges was arbitrary and fundamentally unfair. As we have concluded elsewhere, the prosecution did not prove that this gang evidence had a bearing on the issues of intent and motive. We thus discern 'no permissible inferences' that could be drawn by the jury from this evidence. [Citation.] From this evidence there was a real danger that the jury would improperly infer that whether or not Albarran was involved in these shootings, he had committed other crimes, would commit crimes in the future, and posed a danger to the police and society in general and thus he should be punished. Furthermore, this gang evidence was extremely and uniquely inflammatory, such that the prejudice arising from the jury's exposure to it could only have served to cloud their resolution of the issues. In our view, looking at the effect of this evidence on the trial as a whole, we believe that this prejudicial gang evidence was ' "of such quality as necessarily prevents a fair trial." ' [Citation.]" (Albarran, supra, 149 Cal.App.4th at pp. 230–231, fns. omitted.)

As we have explained, some gang evidence would have been properly admitted even if bifurcation of the gang enhancement allegations had been ordered. We cannot say evidence of gang benefit was wholly lacking; expanding a gang's territory or demonstrating it can reach far beyond its home turf seems beneficial to us. Nor can we say the nature and quantity of the evidence was such that it must have affected jurors' resolution of the substantive issues. In sum, and in contrast to Albarran, this case does not "present[ ] one of those rare and unusual occasions where the admission of evidence has violated federal due process and rendered [appellants'] trial fundamentally unfair." (Albarran, supra, 149 California at p. 232.)

(LD 4, pp. 45-55).

2. Federal Standard.

As argued by Respondent, there is no clearly established Federal law which holds that joinder or consolidation of charges may violate the U.S. Constitution. In United States v. Lane, 474 U.S. 438, 446 n. 8, 106 S.Ct. 725 (1986), the Supreme Court stated in a footnote that "[i]mproper joinder does not, in itself, violate the Constitution. Rather, misjoinder would rise to the level of a constitutional violation only if it results in prejudice so great as to deny a defendant his Fifth Amendment right to a fair trial." However, in Young v. Pliler, the Ninth Circuit noted:

Lane considered only the effect of misjoinder under Federal Rule of Criminal Procedure 8, and expressly stated that no constitutional claim had been presented. See Lane, 474 U.S. 438, 446 & n. 9, 106 S.Ct. 725, 88 L.Ed.2d 814 (1986). Thus, Lane's broad statement-found in a footnote without citation to any legal authority-that misjoinder could only rise to the level of a constitutional violation if it was so prejudicial as to violate due process, was probably dictum. Only Supreme Court holdings are controlling when reviewing state court holdings under 28 U.S.C. § 2254; Court dicta and circuit court authority may not provide the basis for granting habeas relief. Lockyer v. Andrade, 538 U.S. 63, 71–72, 123 S.Ct. 1166, 155 L.Ed.2d 144 (2003).

23

Young, 273 Fed.Appx. 670, n. 1, 2008 WL 1757564 (9th Cir.2008) (unpublished); see also Collins v. Runnels, 603 F.3d 1127, 1132–33 (9th Cir.2010).

In ascertaining what constitutes "clearly established Federal law," the Court must look to the "holdings, as opposed to the dicta, of [the Supreme Court's] decisions as of the time of the relevant state-court decision." Williams, 592 U.S. at 412. "In other words, 'clearly established Federal law' under § 2254(d)(1) is the governing legal principle or principles set forth by the Supreme Court at the time the state court renders its decision." Id. Given that there is no clearly established Federal law in this instance, the Court cannot grant relief, since habeas relief is triggered only when the state court adjudication runs afoul of clearly established federal law. This is also true with the broader issue of admission or exclusion of evidence in a state court trial. See, e.g., Estelle v. McGuire, 502 U.S. 62, 67 (1991); Jammal v. Van de Kamp, 926 F.2d 918, 920 (9th Cir. 1991)(admission of evidence is valid habeas issue only when the admission of the evidence resulted in a fundamentally unfair trial.

3. Analysis.

However, even assuming, arguendo, that the Supreme Court's footnote could be considered clearly established Federal law, no constitutional violation occurred in this case. "Improper joinder does not, in itself, violate the Constitution. Rather, misjoinder would rise to the level of a constitutional violation only if it results in prejudice so great as to deny a defendant his right to a fair trial." United States v. Lane, 474 U.S. 438, 446, fn. 8. Joinder of offenses results in a constitutional violation only if it renders a state trial unfair and violates due process. Herring v. Meachum, 11 F.3d 374, 377 (2nd Cir. 1993). A defendant must show actual prejudice resulted from the events as they unfolded during trial. Herring, 11 F.3d at 378, citing Opper v. U.S., 348 U.S. 84, 94-95 (1954). This prejudice is shown if the impermissible joinder had a substantial and injurious effect or influence in determining the jury's verdict. See Bean v. Calderon, 163 F.3d 1073, 1086 (9th Cir.1998); see also, Spencer v. Texas, 385 U.S. 554, 562 (1967) (while some prejudice may flow from joinder of offenses in criminal offenses, the risk is justified by convenience and guarded against by limiting instructions); Featherstone v. Estelle, 948 F.2d 1497, 1503 (9th Cir. 1991) (consolidation rests in the sound discretion of the state trial court).

Moreover, even assuming, arguendo, that clearly established federal law existed on this issue sufficient to qualify it as a legitimate federal habeas question, Petitioner has not made the required

showing that joinder of Petitioner's substantive charges with his gang enhancement charges resulted in actual prejudice or violated his right to due process.

While conceding that the prosecution took the statutory requirement to prove two predicate crimes in order to establish that an organization is a street gang as an opportunity to present numerous instances of crimes committed by gang members, the 5th DCA nevertheless went on to conclude that the abundance of inflammatory evidence presented by the overzealous prosecutor did not rise to the level of a federal constitutional violation.  In so ruling, the state court pointed to both the fact that the victim was engaged in gang activities, i.e., "cooking" drugs at home in the presence of his children, and to the violent nature of the charged offenses, which, in the 5th DCA's view, were as violent as the predicate acts introduced by the prosecution, and thus "neutralized" to some extent the prejudicial effect of the challenged evidence.  The court also explained the evidence of Petitioner's guilt "was very strong, and the gang-violence evidence was not pervasive."  Finally, the court noted the jurors were instructed to consider the gang evidence "only for the limited purpose of deciding whether a defendant acted with the intent, purpose, and knowledge required to prove the gang-related crime and enhancement and special circumstance allegations that were charged, and it cautioned jurors that they could not conclude from the evidence that a defendant was a person of bad character or had a disposition to commit crimes."

The Court agrees with the state court that there is a "fine line" between evidence that "constitutes legitimate proof of statutory elements" and evidence that "constitutes illegitimate proof of guilt by association."  However, considering all of the circumstances, the Court cannot conclude the 5th DCA's adjudication is objectively unreasonable.  The Court agrees the proof of guilt in this case was very strong, the gang evidence was not pervasive, and the judge gave the appropriate limiting instructions which, it must be assumed, the jury read and followed.  Considering the State of California permits the introduction of such evidence to prove the special allegations and enhancements, and the State also vests in the trial judge great discretion regarding the admission of such evidence in a trial on the substantive criminal charges, this Court is not persuaded that the admission of such gang evidence in this case resulted in prejudice so great that it denied Petitioner his right to a fair trial.  United States v. Lane, 474 U.S. 438, 446, fn. 8.  Accordingly, this claim should be denied.

B.  Identification of Petitioner

Petitioner next contends that the identification procedures used to identify Petitioner were impermissibly suggestive.  This contention is also without merit.

1.  The 5th DCA's Opinion.

The 5th DCA rejected Petitioner's claim as follows:

Appellants contend that impermissibly suggestive procedures violated due process and tainted various identifications of them as the perpetrators. We conclude the identifications were properly admitted and that no due process violation has been shown.

1. General Legal Principles

"'[A] violation of due process occurs if a pretrial identification procedure is "so impermissibly suggestive as to give rise to a very substantial likelihood of irreparable misidentification." [Citations.]'" (People v. Sanders (1990) 51 Cal.3d 471, 508; Simmons v. United States, (1968) 390 U.S. 377, 384.) A "defendant's protection against suggestive identification procedures encompasses not only the right to avoid methods that suggest the initial identification, but as well the right to avoid having suggestive methods transform a selection that was only tentative into one that is positively certain. [Citation.] While a witness is entitled to become surer of an identification, due process precludes the generation of that increased certainty through a suggestive [identification procedure]. [Citations.]" (Raheem v. Kelly (2d Cir.2001) 257 F.3d 122, 135.)

"'"In deciding whether an extrajudicial identification is so unreliable as to violate a defendant's right to due process, the court must ascertain (1) 'whether the identification procedure was unduly suggestive and unnecessary,' and, if so, (2) whether the identification was nevertheless reliable under the totality of the circumstances.'" [Citation.]" (People v. Gonzalez (2006) 38 Cal.4th 932, 942; see Stovall v. Denno (1967) 388 U.S. 293, 302, *overruled on other grounds* in Griffith v. Kentucky (1987) 479 U.S. 314, 320–328.) "The cases hold that despite an unduly suggestive identification procedure, we may deem the identification reliable under the totality of the circumstances, after we consider such factors as the witness's opportunity to view the suspect at the time of the offense, the witness's degree of attention at that time, the accuracy of the witness's prior description, the level of certainty the witness expressed when making the identification, and the lapse of time between the offense and the identification. [Citation.]" (People v. Cook (2007) 40 Cal.4th 1334, 1354; Neil v. Biggers (1972) 409 U.S. 188, 199–200.)

The defendant bears the burden of demonstrating " 'that the identification procedure resulted in such unfairness that it abridged his rights to due process. [Citation.]' [Citations.]" (People v. Sanders, supra, 51 Cal.3d at p. 508.) The defendant must show that the procedure was both unduly suggestive and unfair "'as a demonstrable reality, not just speculation.' [Citation.]" (People v. Cook, supra, 40 Cal.4th at p. 1355.) Contrary to Nichols's statement that the standard of review is unsettled, "[w]e review deferentially the trial court's findings of historical fact, especially those that turn on credibility determinations, but we independently review the trial court's ruling regarding whether, under those facts, a pretrial identification procedure was unduly suggestive." (People v. Gonzalez, supra, 38 Cal.App.4th at p. 943; People v. Kennedy (2005) 36 Cal.4th 595, 608–609.)

2. T.'s Identification of Dean

a. Background

26

While Detective Blake was interviewing T. shortly after the homicide, other officers were attempting to develop possible suspects. Brocchini put together a photographic array based both on physical descriptions given by T. and on persons who had been suspected of committing robberies in Modesto in the recent past. It did not contain appellants. Blake showed it to T. about 1:40 a.m. She was unable to pick out anyone. Brocchini subsequently gave Blake four more photographic lineups, which Blake showed to T. that afternoon. One of the lineups contained five photographs, while the others contained six each. None were of appellants. T. did not select anyone.

As the investigation focused on appellants, Blake obtained photographic lineups that included them. On the morning of March 7, 2002, he took People's exhibit 30–2, in which Dean's photograph appeared in the bottom right-hand corner, to T.'s house to show her.42 Before showing her the photographs, Blake read her the standard so-called Simmons43 advisement that admonished her that the fact the photographs were shown to her should not influence her judgment, and that it was as important to free innocent persons from suspicion as to identify guilty parties. T. studied the photographs, then pointed to Dean's picture and said, "'He's one of them. He was in my house.'" T. said he was the person who took her to the master bath to be with her children, and who watched over her during the incident. She also said he shot from the outside into the closet door in the master bedroom. T. looked at the photographs for about two seconds; there was no hesitation in her identification. At trial, T. confirmed that she recognized Dean when viewing the photographs.

Appellants objected to People's exhibit 30–2, arguing that the photographic lineup was suggestive because Dean's photograph stood out from the others due to the degree of brightness in the picture.45 Counsel for Dean described Dean's photograph as looking "like the only one for which a flash unit was used." The prosecutor responded that, although the flash "lit [Dean] up," the array was not unduly suggestive because all of the photographs were of similar-looking individuals. The trial court examined the exhibit and found that the faces and hairstyles were all fairly similar, and that all of the individuals had facial hair; with respect to differences, Dean's picture was brighter than the others, and he was the only person wearing a white shirt. The trial court concluded that, looking at the lineup overall, it was not "unfair or necessarily something that would lead to an improper identification or that would make [Dean] quicker to be chosen because of those differences"; hence, there was no due process violation. As set out in the statement of facts, ante, T. identified all three appellants at trial. She testified that she estimated she was at the doorway of the bathroom for around five minutes, and that about 10 minutes elapsed between when the intruders entered the house until Ruiz was shot.

b. Analysis

Appellants complain that the photograph of Dean contained in People's exhibit 30–2 stands out because it is brighter than the other photographs, and Dean is the only individual wearing a white shirt. They also contend that the fact a detective took the array to T.'s house in the middle of the day, four days after the homicide, implicitly telegraphed to her that there was a likely suspect in the lineup.

"To determine whether a procedure is unduly suggestive, we ask 'whether anything caused defendant to "stand out" from the others in a way that would suggest the witness should select him.' [Citations.]" (People v. Yeoman, supra, 31 Cal.4th at p. 124.) We have examined the exhibit in question; all the photographs are of African–American males, generally of the same age, complexion, and build, and all with some sort of facial hair. Minor differences in facial hair, hair style, background color, and image size do not make a lineup suggestive. (People v. Johnson (1992) 3 Cal.4th 1183, 1217; see People v. Holt (1972) 28 Cal.App.3d 343, 350, disapproved on other grounds in Evans v. Superior Court (1974) 11 Cal.3d 617, 625, fn. 6.) Similarly, a lineup is not made suggestive by the fact the defendant is the only participant wearing a certain type of clothing, at least where, as here, the clothing is neither distinctive nor

27

does it match important elements of the description provided by the witness. (See Foster v. California (1969) 394 U.S. 440, 442–443; People v. Gonzalez, supra, 38 Cal.4th at p. 943–944; People v. Carter, supra, 36 Cal.4th at pp. 1162–1163; People v. Johnson, supra, 3 Cal.4th at p. 1217; Raheem v. Kelley, supra, 257 F.3d at pp. 134–135.) As for appellants' claim the circumstances under which the photographs were shown implicitly telegraphed to T. that there was a suspect in the lineup, "'[a]nyone asked to view a lineup would naturally assume the police had a suspect.' [Citation.] This circumstance does not render the lineup unduly suggestive. [Citation.]" (People v. Avila (2009) 46 Cal.4th 680, 699.)

This leaves us to consider the undeniable fact that Dean's photograph is brighter than the rest. Differences in images, such as discoloration, the size of the border around the photograph, and whether some images are glossy while others are not, are generally held to be "trivial distinctions [that] are immaterial. [Citation.]" (People v. Carter, supra, 36 Cal.4th at p. 1163; see, e.g., People v. Gonzalez, supra, 38 Cal.4th at p. 943; People v. Johnson, supra, 3 Cal.4th at p. 1217.) Here, Dean's photograph is only somewhat brighter than the photograph in the upper left-hand corner, and differences in photographic quality and lighting are apparent in all six photographs.

Even were we to find the photographic array somewhat suggestive, under the totality of the circumstances, and considering the factors set out in Neil v. Biggers, supra, 409 U.S. at pages 199–200, we find "no substantial likelihood" that T. (or R., for that matter) misidentified Dean when viewing the six photographs. (People v. Cunningham (2001) 25 Cal.4th 926, 990; People v. Sanders, supra, 51 Cal.3d at pp. 508–509; see People v. Phan, supra, 14 Cal.App.4th at p. 1462.) Accordingly, no due process violation as been shown.

3. R.'s Identification of Dean

    a. Background

At the time Blake read the admonishment to T. and showed her People's exhibit 30–2, he and she were at the dining room table. R. and her brother were watching a videotape in the living room, just off of the dining area. The rooms are separated by a half wall and a step, so that the living room is about eight or nine inches lower than the dining room. The children were seated on a couch, facing the television, and appeared to be paying attention to it. The table where Blake and T. sat was about 20 feet away and behind the children. Blake was seated facing the living room, and he kept his eye on the children and paid attention to where they were while T. was looking at the photographs. When having different witnesses look at a lineup, Blake seeks to separate them so that they do not influence each other. He believed he was able to accomplish that in this instance. Generally speaking, the children were in a position in which they could not see what Blake and T. were doing. Blake did not believe the children could hear the exact words he and T. were using.

After T. finished looking at People's exhibit 30–2, she gave Blake a piece of evidence she had found. He and she were concentrating on that when R. came up to the table and looked at the lineup, which was lying by T.'s hand. R. pointed to Dean's picture and said, "'he was in my house.'" R. told Blake that after she had crawled out of the bathroom window, she saw two groups of men run past her. Dean was in the first group. It did not strike Blake as odd that R. used almost the same terminology as T.; in his experience, children mimic the type of language and grammar that their parents use or that they are around.

Appellants objected that R. saw T. make the identification and made the same identification for that reason; accordingly, R.'s identification was tainted. The prosecutor responded that the identifications were made separately. The trial court ruled that the jury should determine, as part of the case, whether R. was sufficiently isolated from T.'s identification.

At trial, R. testified that the man whose photograph she identified was the one who came into the room, went back out, and brought her mother in. She was "[r]eally sure" the man in the photograph was one of the robbers who was in the house that night. She also saw him again when she was on her way to the neighbor's house. He was one of the men by the fence. She saw him there for about 10 seconds. When shown People's exhibit 30–2 by the prosecutor, she identified the picture of Dean as being the person with the messed-up teeth who brought her mother into the room. She then identified Dean in court.

On cross-examination, R. testified that at the time she was shown the photographs, she was told to pick out a person who looked like he had been in the house. The investigator and T. were present when R. was shown the photographs, and T. was sitting next to R.R. thought the investigator had already shown photographs to T.; she did not know whether T. had picked any out because R. was not sitting next to T. the whole time. Instead, R. was walking around the house and watching television. R. was in the living room and T.'s bedroom. A bar or divider separated the living room from the dining room, although R. was tall enough to see over it. R. testified that she and T. talked about what happened on the night Ruiz was shot; however, T. only asked what R. had seen, and did not tell R. what she (T.) saw.

        b. Analysis

Appellants contend R.'s identification of Dean was tainted by her having seen her mother make an identification of Dean. The record does not support a conclusion that R. had any idea that T. had made an identification, let alone which photograph she chose. Under the circumstances, appellant has failed to show that the identification procedure was unduly suggestive or that R.'s identification of Dean was tainted. (See People v. Cook, supra, 40 Cal.4th at pp. 1354–1355; People v. Clark (1992) 3 Cal.4th 41, 136, fn. 17.) The jury was free to take the circumstances under which the identification was made, and Eisen's testimony, into account in determining the weight to give to R.'s identification of Dean.

(LD 4, pp. 56-63).

        2. Federal Standard.

    It is clearly established federal law that a defendant has a due process right not to be identified prior to trial in a manner that is "unnecessarily suggestive and conducive to irreparable mistaken identification." Stovall v. Denno, 388 U.S. 293, 301-02, 87 S.Ct. 1967, 1972 (1967), *overruled on other grounds by* Griffith v. Kentucky, 479 U.S. 314, 326, 107 S.Ct. 708 (1987). The U.S. Supreme Court has adopted a "totality of the circumstances" test to be used in the analysis of identification testimony. Manson v. Brathwaite, 432 U.S. 98, 114, 97 S.Ct. 2243, 2253 (1977). Identification testimony, even if flawed by improper police behavior, remains admissible if it appears reliable. Id.; see also Neil v. Biggers, 409 U.S. 188, 199, 93 S.Ct. 375, 382 (1972); Simmons v. United States, 390 U.S. 377, 384, 88 S.Ct. 967 (1968); Stovall, 388 U.S. at 302. Thus, an unnecessarily suggestive identification is not subject to a "per se" exclusion. Manson, 432 U.S. at 114.

In <u>United States v. Wade</u>, the Supreme Court described "numerous instances of suggestive procedures:"

> that all in the lineup but the suspect were known to the identifying witness, that the other participants in a lineup were grossly dissimilar in appearance to the suspect, that only the suspect was required to wear distinctive clothing which the culprit allegedly wore, that the witness is told by the police that they have caught the culprit after which the defendant is brought before the witness alone or is viewed in jail, that the suspect is pointed out before or during a lineup, and that the participants in the lineup are asked to try on an article of clothing which fits only the suspect.

<u>Wade</u>, 388 U.S. 218, 233, 87 S.Ct. 1926 (1967) (footnotes omitted). The Court also cited other "striking examples:"

> In a Canadian case ... the defendant had been picked out of a line-up of six men, of which he was the only Oriental. In other cases, a black-haired suspect was placed among a group of light-haired persons, tall suspects have been made to stand with short non-suspects, and, in a case where the perpetrator of the crime was known to be a youth, a suspect under twenty was placed in a line-up with five other persons, all of whom were forty or over.

<u>Id</u>. at 232, 87 S.Ct. 1926 (quoting Patrick M. Wall, Eye–Witness Identification in Criminal Cases 53).

Suggestive lineups, the Supreme Court has explained, are particularly dangerous because they can taint later proceedings: "Regardless of how the initial misidentification comes about, the witness thereafter is apt to retain in his memory the image of the photograph rather than of the person actually seen, reducing the trustworthiness of subsequent lineup or courtroom identification." <u>Simmons</u>, 390 U.S. at 383–84. As the Court warned: "A major factor contributing to the high incidence of miscarriage of justice from mistaken identification has been the degree of suggestion inherent in the manner in which the prosecution presents the suspect to witnesses for pretrial identification." <u>Wade</u>, 388 U.S. at 228. Guarding against the effects of suggestive identification practices is critical to conducting a fair trial.

As mentioned, however, even a suggestive lineup does not violate due process if the identification has independent reliability. To determine whether there is such reliability, the Supreme Court requires federal courts to consider the "totality of the circumstances," including the following factors: (1) the informer's opportunity to view the criminal at the time of the crime, (2) the witness' degree of attention, (3) the accuracy of the witness' prior description of the criminal, (4) the level of certainty demonstrated by the witness at the confrontation, and (5) the length of time between the crime and confrontation. <u>Manson</u>, 432 U.S. at 113-114; <u>Neil v. Biggers</u>, 409 U.S. at 199-200.

1   The defendant bears the burden of demonstrating the existence of an unreliable identification

2   procedure. [Citations.] "The question is whether anything caused defendant to 'stand out' from the others in a way that would suggest the witness should select him." [Citation.] ¶ Moreover,

3   there must be a "substantial likelihood of irreparable misidentification" under the "'"totality of the circumstances"'" to warrant reversal of a conviction on this ground.

4   <u>Manson</u>, 432 U.S. at 104–107; <u>see also Johnson v. Sublett</u>, 63 F.3d 926, 929 (9th Cir.1995).

5       State findings concerning the factors outlined by the Supreme Court in <u>Neil v. Biggers</u> are

6   considered factual and must therefore be granted a presumption of correctness. 28 U.S.C. § 2254(e)(1);

7   <u>see Jarrett v. Headley</u>, 802 F.2d 34, 42 (2d Cir.1986); <u>Sumner v. Mata</u>, 445 U.S. 591, 592, 102 S.Ct.

8   1303 (1981). However, the ultimate question of constitutionality of pretrial identification procedures is

9   a mixed question of fact and law, and hence is not governed by the presumption. <u>Sumner</u>, 449 U.S. at

10   597. "[T]he federal court may give different weight to the facts as found by the state court and may

11   reach a different conclusion in light of the legal standard. But the questions of fact that underlie this

12   ultimate conclusion are governed by the statutory presumption...." <u>Id</u>. (emphasis in original). Thus,

13   whether a witness had the opportunity to observe the crime or gave a detailed description are questions

14   of fact to which the presumption applies. <u>Sumner,</u> 455 U.S. at 596.

15       Under the AEDPA, a determination of whether a court has unreasonably applied a legal

16   standard depends in large measure on the specificity of the standard at issue. Indeed, "[a]pplying a

17   general standard to a specific case can demand a substantial element of judgment," <u>Yarborough</u>, 541

18   U.S. at 664, whereas a standard defined with exacting specificity can be applied almost mechanically.

19   Therefore, "[t]he more general the rule, the more leeway courts have in reaching outcomes in case-by-

20   case determinations." <u>Id</u>.

21       3. <u>Analysis</u>.

22       Preliminarily, the Court notes that the state court decision relies upon the standard set forth in

23   <u>Simmons</u>. Hence, the state court applied the correct federal standard, and the only task remaining is to

24   determine whether the state court's application of that standard was objectively unreasonable. In the

25   Court's view, it was not.

26       Petitioner's main complaint is that his photograph was "strongly lit" and therefore stood out

27   among the other "dark and shadowy" photographs. (Doc. 1, p. 3). Petitioner also contends that the

28   lineup was "hastily assembled" and then "transmitted electronically" to the local police. (<u>Id</u>.). The 5th

DCA spent considerable time discussing Petitioner's allegation that his photograph was unusually bright before rejecting it.  The state court noted that Petitioner's photo was only "somewhat brighter" than one of the other photos, and that all of the photos exhibited "differences in photographic quality and lighting."  However, the court also observed that, after examining the photographs, it was apparent that all of the photos were of African American males of approximately the same age, complexion, and build and that all had some form of facial hair. The court also noted that the officer assigned to the lineup gave the witness the appropriate admonition under Simmons, and that the witness, without hesitation, identified Petitioner in about two seconds.  Under all of the circumstances, the state court's adjudication that the lineup was not unconstitutionally suggestive was not objectively unreasonable. Hence, the claim should be denied. [2]

C.  Prosecutorial Misconduct

Petitioner next claims that the prosecution committed conduct by withholding material evidence.  This contention too is without merit.

1.  The 5th DCA's Opinion.

The 5th DCA rejected Petitioner's claim as follows:

Appellants contend the judgments must be reversed because the prosecution violated Brady v. Maryland (1963) 373 U.S. 83 (Brady) and its progeny by withholding evidence that Phillip Collins was a gang member, that he perjured himself on that point, and that Detective Brocchini and Sergeant Helton corroborated the perjury. We find no cause for reversal of the judgments.

1.  Background

Collins's involvement in the case is summarized in the statement of facts, ante. During examination by the prosecutor, he testified that he "hung out" with Bloods while growing up on the west side of Modesto and bought drugs from them. He further testified that gang members use tattoos to signify what gang they are from, and that he had seen them use geographical tattoos such as the name of their town or "'West Side,'" "'North Side,'" or " 'East Side.'" On cross-examination, Collins testified that he was never a gang member. He admitted having a "Westside Blood" tattoo, but, when asked whether that term had a gang connotation, he said he got it in CRC to fit in, and that there were no Westside Bloods in Modesto. When asked, "So you were just a Westside Blood in CRC?" Collins replied, "Yes."

---

[2] The 5th DCA's opinion addresses the identifications made by both the victim's wife and his daughter.  However, in his petition, Petitioner only objects to the identification made by the wife.  (Doc. 1, p. 3).  Accordingly, the Court does not address the constitutionality of the daughter's identification of Petitioner.

Helton testified on cross-examination that, to his knowledge, Collins was never a member of a criminal street gang, and that Helton probably would have known had he been. When Brocchini was asked, "Is Phil Collins a gang member?" he replied, "No." Asked how he knew, Brocchini testified: "Because I worked in the gang unit for a long time and I knew Phil Collins, too. He was a drug dealer."

Appellants each filed a motion for new trial. Nichols asserted in part that Brocchini had prepared a report, dated February 10, 1998, in which Collins was included as a member of the Oak Street Posse (OSP), a known criminal street gang, and that this information was material to Collins's credibility, known by Brocchini, and not disclosed to the defense. A copy of the report, which identified "Collins, Phillip" as the person listed as "Philthy Phill" in the "105" column of the OSP roster, was attached as an exhibit.

An evidentiary hearing was held. Brocchini testified that about a year after his trial testimony, he was reviewing the particular MPD case report number referenced on a subpoena he received from the defense when he found a report he had written as a gang deputy in 1998. The report concerned a handwritten list found by a deputy in the jail cell of Norval Williams. It was a then-current list of OSP gang members. In 1998, OSP, a Black criminal street gang operating in Stanislaus County, had both Crips and Bloods in it. The list was split into two halves, the 105 section and the 213 section, with those numbers being addresses on Oak Street. The 105 section was Blood gang members who claimed OSP, while the 213 section was Crip gang members who claimed OSP. After the list was found under a bunk in the jail, Brocchini deciphered the identity of some of the people. He was able to do so from working in the gang unit for a long time and talking to them and hearing what they called each other. One of the names on the list was "Philthy Phill," whom Brocchini identified as the same Phillip Collins who testified at trial. In writing the report, Brocchini never said Collins was a Blood; Collins was listed by an OSP member as being in that gang as a Blood. When Brocchini heard Collins deny at trial that he was a gang member, Brocchini believed him because Brocchini had not come across any field identification cards with Collins's name on them.

Brocchini further testified that at trial, because he was asked to render an opinion concerning whether appellants were criminal street gang members, he did a gang workup on them. He did not do anything similar with regard to Collins during the pendency of this matter. Moreover, he would not identify anyone as a gang member simply because the person's name was on the roster, because that alone would not meet a sufficient number of MPD's criteria. Collins had a gang tattoo, and Brocchini knew he associated with gang members and that he had been named by other people as a gang member at the time Collins testified. That fit three of the criteria used by MPD to establish who was a gang member. Even assuming Collins was a gang member in 1998, however, this would not necessarily mean he was still a gang member when he testified, as it is possible to get out of the gang. Brocchini did not know about Collins's tattoo until Collins testified about it, and he opined that Collins was not a gang member at the time Collins testified that he was not a gang member.

Brocchini did not tell anyone about the OSP roster or give a copy to the defense prior to trial because he did not remember it. The list was in a file regarding Norval Williams. Given the way MPD's database was set up, the only name entered in it would have been the one indexed on the front, i.e., Williams. The MPD gang unit did not keep an individual file for each suspected gang member; there was no file for Collins.

In its written ruling on the new trial motions, the trial court stated: "The Court finds Detective Brocchini's testimony to be disingenuous. In 1998, Collins was associating with gang members, had a gang monicker [sic ], a gang tattoo, and was listed on a gang roster. MPD's own criteria provide that a person isn't considered a 'drop-out' until there has been at least 5 years of no activity. In stating his opinion at trial, Brocchini did not state the many gang indicators that he was disregarding in reaching his fairly incredible opinion. Moreover, his

opinion appears to have been made for the purpose of bolstering Collins['s] credibility in the eyes of the jury. The Court believes that Detective Brocchini withheld material information in testifying to this opinion." In examining this and other defense claims concerning the gang evidence, the court found "plentiful evidence of gang membership, but scant evidence of gang benefit," and that "[t]he only evidence which the jury could have relied on in reaching their decision was the opinions of the 2 experts [Brocchini and Okamoto]." The court concluded: "[T]aken individually, each of [the enumerated] problems with the gang testimony were [sic ] not sufficient to raise a concern for the integrity of the process. However, when viewed in the aggregate, the Court does have a serious concern whether the proceedings leading to the jury's true finding[s] on the PC § 186.22(b)(1) gang enhancement were fundamentally fair. Accordingly, the Court orders the jury's finding on this enhancement stricken on each of the counts.... [¶] In all other respects, the motion is denied and the verdicts affirmed."

2. Analysis

"[T]he suppression by the prosecution of evidence favorable to an accused ... violates due process where the evidence is material either to guilt or to punishment, irrespective of the good faith or bad faith of the prosecution." (Brady, supra, 373 U.S. at p. 87.)29 The duty to disclose such evidence is wholly independent of the prosecutor's obligation under section 1054 et seq .30 (People v. Hayes (1992) 3 Cal.App.4th 1238, 1244), exists even where there has been no request by the accused (United States v. Agurs (1976) 427 U.S. 97, 107), encompasses both impeachment and exculpatory evidence (United States v. Bagley (1985) 473 U.S. 667, 676), and extends to evidence known only to law enforcement investigators and not to the prosecutor (Youngblood v. West Virginia (2006) 547 U.S. 867, 869–870; Kyles v. Whitley (1995) 514 U.S. 419, 438; In re Brown (1998) 17 Cal.4th 873, 879). "In order to comply with Brady, therefore, 'the individual prosecutor has a duty to learn of any favorable evidence known to others acting on the government's behalf in the case, including the police.' [Citations.]" (People v. Salazar (2005) 35 Cal.4th 1031, 1042, quoting Kyles v. Whitley, supra, 514 U.S. at p. 437; In re Brown, supra, 17 Cal.4th at p. 879.) Disclosure must be made at a time when it would be of value to the accused. (People v. Superior Court (Meraz) (2008) 163 Cal.App.4th 28, 51.)

Although "the term 'Brady violation' is sometimes used to refer to any breach of the broad obligation to disclose exculpatory evidence—that is, to any suppression of so-called 'Brady material'—... there is never a real 'Brady violation' unless the nondisclosure was so serious that there is a reasonable probability that the suppressed evidence would have produced a different verdict." (Strickler v. Greene (1999) 527 U.S. 263, 281, fn. omitted.) Thus, to merit relief on due process grounds, "the evidence a prosecutor failed to disclose must have been both favorable to the defendant and material on either guilt or punishment. Evidence would have been favorable if it would have helped the defendant or hurt the prosecution, as by impeaching one of its witnesses. Evidence would have been material only if there is a reasonable probability that, had it been disclosed to the defense, the result would have been different. The requisite reasonable probability is a probability sufficient to undermine confidence in the outcome on the part of the reviewing court. It is a probability assessed by considering the evidence in question under the totality of the relevant circumstances and not in isolation or in the abstract. [Citation.]" (People v. Dickey (2005) 35 Cal .4th 884, 907–908; Kyles v. Whitley, supra, 514 U.S. at pp. 434–435, 436; In re Brown, supra, 17 Cal.4th at pp. 886–887.) "A showing by the [defendant] of the favorableness and materiality of any evidence not disclosed by the prosecution necessarily establishes at one stroke what in other contexts are separately considered under the rubrics of 'error' and 'prejudice.' For, here, there is no 'error' unless there is also 'prejudice.' [Citations.] It follows that harmless-error analysis under Chapman v. California (1967) 386 U.S. 18, 24 [(Chapman )], with its standard of 'harmless beyond a reasonable doubt,' is not implicated." (In re Sassounian (1995) 9 Cal.4th 535, 547, fn. 7; Kyles v. Whitley, supra, 514 U.S. at pp. 435–436; In re Brown, supra, 17 Cal.4th at p. 887.) "In sum, once there has been ... error ..., it cannot subsequently be found harmless...."

(Kyles v. Whitley, supra, 514 U.S. at p. 436, fn. omitted.) Conclusions of law and mixed questions of law and fact, such as the elements of a Brady claim, are subject to independent review. (People v. Salazar, supra, 35 Cal.4th at p. 1042.)

We turn first to whether the undisclosed evidence would have been favorable to appellants. This was not the typical situation in which gang involvement provided a readily apparent bias or interest or motive to testify, as when a member of one gang testifies in favor of a member of the same or an allied gang, or when a witness is reluctant to testify for fear of retaliation. (See, e.g., People v. Ayala (2000) 23 Cal.4th 225, 276–277; People v. Sanchez (1997) 58 Cal.App.4th 1435, 1449–1450.) Nevertheless, we assume Collins's gang status was relevant to his credibility. (See People v. Samaniego (2009) 172 Cal.App.4th 1148, 1168.) This being the case, Brocchini's 1998 report should have been disclosed to the defense, if not before trial, then certainly once Collins testified that he was not a gang member. Instead of disclosing information he possessed to the contrary, however, Brocchini confirmed that Collins indeed was not a gang member. Even if this was his honest opinion, the defense had the right—and should have had the opportunity—to challenge both him and Collins, especially in light of the fact Collins met several of MPD's gang criteria.

We turn now to the question of materiality. In making our assessment, we have undertaken the cumulative evaluation required (Kyles v. Whitley, supra, 514 U.S. at p. 441), and taken into consideration the effect of the nondisclosure on defense investigations and trial strategies (United States v. Bagley, supra, 473 U.S. at pp. 682–683; People v. Zambrano (2007) 41 Cal.4th 1082, 1132–1133, disapproved on other grounds in People v. Doolin (2009) 45 Cal.4th 390, 421, fn. 22). We conclude the suppressed evidence was not material under all the circumstances, as there is no reasonable probability its disclosure would have altered the trial result. (People v. Zambrano, supra, 41 Cal.4th at p. 1132.)

With respect to Collins, "'[i]n general, impeachment evidence has been found to be material where the witness at issue "supplied the only evidence linking the defendant(s) to the crime," [citations], or where the likely impact on the witness's credibility would have undermined a critical element of the prosecution's case, [citation]. In contrast, a new trial is generally not required when the testimony of the witness is "corroborated by other testimony," [citations].' [Citation.]" (People v. Salazar, supra, 35 Cal.4th at p. 1050.) Here, the most important portions of Collins's testimony—especially his identification of appellants as the perpetrators—was corroborated by the testimony of T. and, to a certain extent, R., as well as by circumstantial evidence. Brocchini's undisclosed report did not absolutely establish Collins was a gang member; moreover, jurors were aware that Collins associated with gang members and that he had a tattoo that Officer Okamoto, one of the prosecution's gang experts, testified was a common gang tattoo. Jurors knew from Brocchini's own testimony that the existence of gang tattoos and association with gang members were two matters that gang experts found indicative of gang membership.

Most importantly, even assuming jurors would have concluded Collins lied about his gang status, such a conclusion would not have significantly altered the picture jurors already had of Collins or the myriad reasons to question his credibility on less collateral matters. The evidence showed that Collins entered into a deal with law enforcement authorities whereby he would set up his best friend, a man he had known since childhood. Under this deal, Collins was supposed to plead guilty to selling drugs and serve a sentence in the local jail, but, despite the fact he supposedly was not receiving any consideration for his testimony in the homicide case, he ended up not even being prosecuted in his case. When the operation against Ruiz went federal, Collins was no longer working off a case, but instead was working for monetary compensation. Significantly, despite the fact the agreement specifically targeted Ruiz and his drug operation, Collins never alerted Helton or Hammond to appellants' presence or desire to purchase a quarter kilo of cocaine from Ruiz, nor did he ever truly explain why he did not alert either of them. According to Helton, this was a significant enough amount of drugs that he

35

would "[c]ertainly" have wanted to know about it. When Helton first contacted Collins to notify him of Ruiz's death, Collins said nothing about his knowledge or suspicions. Similarly, he said nothing to Brocchini when Brocchini contacted him the day after the shooting.

In light of the foregoing, the undisclosed evidence, while favorable to appellants insofar as it tended to impeach Collins's credibility, was not material "because it would have added little to the cumulative impact of the other impeachment evidence." (People v. Dickey, supra,  Cal.4th at p. 908.) Given the substantial impeachment to which Collins's testimony was subjected at trial, we conclude it is not reasonably probable "that whatever confidence the jury placed in [his] testimony would have been fatally undermined" (ibid.) by learning that a moniker identified as referring to him was listed on a years-old roster for a Modesto criminal street gang, or even that Collins lied in denying he was a gang member. While we do not take potential perjury lightly, this is simply not a case in which the withheld information painted a significantly different picture of Collins and his credibility from the one placed before the jury. (Contrast In re Sodersten, supra, 146 Cal.App.4th at pp. 1233–1235; People v. Johnson (2006) 142 Cal.App.4th 776, 783–786.)

Appellants point to the effect the withheld evidence would have had on Brocchini's credibility. The bulk of Brocchini's testimony concerned the gang enhancement allegations, however, and those were stricken by the trial court. Moreover, defense counsel attacked Brocchini's credibility, ably and at length, and expressly suggested none of his testimony could be trusted. Given the fact the undisclosed report was written approximately eight years before Brocchini testified at trial, it is not at all certain jurors would have concluded Brocchini was lying, as opposed to having a memory lapse, when he testified that Collins was not a gang member.

There is no reasonable probability that, had the 1998 report been disclosed to the defense, appellants would have been acquitted. Accordingly, because the undisclosed evidence was not material, reversal is not warranted.

(LD 4, pp. 32-41).

## 2.  Federal Standard.

Due process requires that the prosecution disclose exculpatory evidence within its possession. Brady v. Maryland, 373 U.S. 83, 87, 83 S.Ct. 1194 (1963); Cooper v. Brown, 510 F.3d 870, 924 (9th Cir.2007). The duty to disclose encompasses impeachment evidence as well as exculpatory evidence. United States v. Bagley, 473 U.S. 667, 676 (1985).  There are three components of a Brady violation: "[t]he evidence at issue must be favorable to the accused, either because it is exculpatory, or because it is impeaching; the evidence must have been suppressed by the State, either willfully or inadvertently; and prejudice must have ensued." Strickler v. Greene, 527 U.S. 263, 281–82, 119 S.Ct. 1936 (1999). See also Banks v. Dretke, 540 U.S. 668, 691, 124 S.Ct. 1256 (2004); Silva v. Brown, 416 F.3d 980, 985 (9th Cir.2005).

"It is settled that due process proscribes a criminal conviction obtained through perjured testimony knowingly used by the prosecution against the accused. (Pyle v. Kansas (1942) 317 U.S. 213,

36

216, 63 S.Ct. 177, 87 L.Ed. 214; Mooney v. Holohan (1935) 294 U.S. 103, 112, 55 S.Ct. 340, 79 L.Ed.

791.) In fact, outright falsity need not be shown if the testimony taken as a whole gave the jury a false

impression. (Alcorta v. Texas (1957) 355 U.S. 28, 31, 78 S.Ct. 103, 2 L.Ed.2d 9.) Thus, a denial of due

process can result if the prosecution, although not soliciting false evidence, allows a misleading and

false impression to go uncorrected when it appears; it matters little that the false impression goes only

to the credibility of a prosecution witness or that the prosecutor's silence was not the result of guile or a

desire to prejudice. (Napue v. Illinois (1959) 360 U.S. 264, 269-70, 79 S.Ct. 1173, 3 L.Ed.2d 1217.).”

  3.  Analysis.

Here, the 5th DCA concluded the purportedly withheld evidence, i.e., Collins' affiliation with a

gang, was not material and, hence, did not fall within the ambit of sanctionable Brady error, even if

such information was withheld by the prosecution.  In reaching that conclusion, the state court noted

that, under California law, impeachment evidence was “material” only when the witness supplied “the

only evidence linking the defendant[s] to the crime” or where the likely impact on the witness's

credibility “would have undermined a critical element of the prosecution's case.  The 5th DCA

concluded neither circumstance was present in Petitioner's trial.  First, Collins' testimony inculpating

Petitioner was corroborated by several other eyewitnesses.  Second, Collins' affiliation with gang

members and the gang itself, albeit in perhaps an informal capacity, had already been established by

other witnesses and by gang tattoos, and his credibility already significantly impeached by evidence of

his highly favorable deal with prosecutors for testifying against Petitioner, who was his lifelong friend.

Under those circumstances, the state court concluded further evidence directly linking Collins to a gang

was not “material” in the sense that its exclusion did not undermine a critical element of the

prosecution's case, i.e., Collins' veracity.  The Court recognizes this conclusion is not a clear-cut one

but requires a court to balance a variety of factors.  Under the AEDPA, however, this Court need not re-

balance those factors as long as the state court's conclusion is not objectively unreasonable.

Petitioner argues the failure of the prosecution to disclose the truth about Collins' gang

affiliation was prejudicial not just because it hindered the defense in attacking Collins' credibility, but

because it also diminished the defense's ability to attack the credibility of Detective Brocchini, whom

Petitioner contends was a crucial prosecution witness, since Brocchini testified at trial that Collins was

not a gang member despite the fact that the detective had prepared a report in 1998 indicating that Collins's name was found on a list of gang members.  (Doc. 27, pp. 32-33).  The state court, however, addressed that contention and rejected it, noting that merely because Collins might have been a gang member in 1998 did not prove he was a gang member when the crimes were committed.  Also, the court noted the failure to disclose the 1998 report, and its potential impact on Brocchini's testimony, would not have had an impact on the outcome of the trial because the bulk of Brocchini's testimony went to the gang enhancement allegations that were stricken by the trial court, defense counsel "ably and at length" attacked Brocchini's credibility before the jury, and the report itself was approximately eight years old by the time of trial, thus raising doubts as to its probative value at trial.  In the Court's view, the state court was justified in concluding that the totality of the circumstances rendered the 1998 report non-material for purposes of a <u>Brady</u> analysis.  Finally, even if some constitutional error was present, Petitioner has failed to show that the non-disclosure of the 1998 report had a "substantial and injurious effect" on the outcome of the trial.  <u>See Brecht v. Abrahamson</u>, 507 U.S. at 637.  Thus, any error was harmless.

     For the reasons discussed above, the Court concludes that the state court's application of <u>Brady</u> was not objectively unreasonable.  Hence, the claim must be denied.[3]

     D.  <u>Admission Of Pathologist's Testimony</u>

     Next, Petitioner claims that the trial court erred in admitting the testimony of the pathologist. This contention too is without merit.

     1.  <u>The 5th DCA's Opinion.</u>

The 5th DCA rejected Petitioner's claim as follows:

> Appellants contend they were denied their confrontation rights when the trial court permitted expert witnesses to testify from reports made by other experts who did not testify. They argue that exclusion of the contents of the reports and the experts' testimony would have precluded conviction or, at least, affected the firearm enhancements. Respondent counters that appellants had the opportunity to "confront" the evidence contained in the reports when the experts testified. We conclude no prejudice has been shown.

>      1. Background

---

[3] In his Traverse, Petitioner contends for the first time that Brocchini also falsely testified during trial that Dupree Hull was a Blood gang member.  (Doc. 27, p. 33). A district court, however, need not consider claims raised for the first time in a traverse. **Error! Main Document Only.**<u>See</u> <u>Cacoperdo v. Demosthenes</u>, 37 F.3d 504, 507 (9th Cir. 1994).

### a. The pathologist's report

Dr. Rulon performed the autopsy on Ruiz. Detective Buehler testified that he attended the autopsy. Also present were a forensic photographer to document the autopsy procedure so that photographs were available if the case ended up going to court, and someone from the district attorney's office.

During the autopsy, Buehler observed three bullets being taken out of the body. One was taken from Ruiz's left pelvis, one from his left neck, and the third from his left armpit. Later that afternoon, Buehler was called back by Dr. Rulon and received a fourth bullet from her. Buehler, who the parties stipulated was an expert in identifying bullets, opined that the first three bullets came from a .22–caliber rimfire cartridge and would have been fired from the same type of firearm. The item he received from Rulon was a similar .22–caliber slug.

During trial, the prosecutor informed the court and defense counsel that Rulon had left the county and was unavailable to testify. As a result, the prosecutor intended to call Dr. Lawrence, her supervisor, to testify regarding her autopsy report, her observations, and various items of physical evidence. Appellants objected, citing Crawford v. Washington (2004) 541 U.S. 36 (Crawford ). Following argument, and after reviewing People v. Beeler (1995) 9 Cal.4th 953 (Beeler), the trial court concluded that, as long as an appropriate foundation was laid, the autopsy report was admissible as a business record under Evidence Code section 1271. The court further determined that, assuming the proposed witness was trustworthy, testimony could be admitted from a doctor who did not perform the autopsy. Appellants argued that Beeler was no longer valid following Crawford, and that to permit a doctor to testify, without making an independent evaluation based on evidence other than the report, violated appellants' confrontation and due process rights. The prosecutor responded that the autopsy report was not testimonial and, hence, not subject to Crawford, and that in any event, Crawford would be satisfied because the defense would be able to cross-examine Lawrence. The court declined to change its ruling.

Lawrence subsequently testified that he was a forensic pathologist, i.e., a doctor who performed autopsies for the purpose of determining cause and circumstances of death. Forensic pathologists look at deaths that are of interest in the legal system.

In 2002, Rulon was an employee of Delta Pathology, which Lawrence founded and owned. Technically, he was her boss. Rulon was a Board-certified pathologist and forensic pathologist like Lawrence, and she was fully experienced and performed throughout her employment in an exemplary fashion. Her reports followed Delta Pathology's protocol or procedure with regard to how autopsy reports should be prepared.

Rulon conducted an autopsy on Ruiz, and Lawrence reviewed her report. Such reports are made in the regular course of Delta Pathology's business. Lawrence also looked at the autopsy photographs and reviewed the investigative information about the general circumstances of the case. Based on those items, he formed the opinion that the cause of Ruiz's death was multiple gunshot wounds.

Ruiz had a total of 11 entrance gunshot wounds on the body. Two were connected to one another, meaning he was struck nine, and possibly 10, times. Ruiz suffered fractures of the facial skeleton, perforation of the lung, and abdominal organ injuries. There were five fatal wounds, meaning they hit vital organs and caused extensive hemorrhage or organ destruction that caused death. Any one of the five could have killed Ruiz, although with good medical treatment, it was within the range of possibility that any given wound would not have been fatal. If Ruiz had received all of the wounds within a relatively short period of time, such as a minute, it was doubtful, but possible, that prompt medical attention could have saved his life.

Several of the wounds had a downward trajectory. A couple had stippling, indicating they were fired probably from a distance of a foot or less.  If a bullet was not found within a wound, Lawrence could not tell the caliber of the gun. Generally speaking, Lawrence could not tell Ruiz's or the shooter's position just by looking at the wound, although it might be possible to say a certain position was consistent or inconsistent with a particular wound.

The mechanism of death was shock and hemorrhage. It was due directly and primarily to the gunshot wounds. There was no significant natural disease that could have caused death. Lawrence could say with medical certainty that Rulon's opinion was the correct one.

Appellants reiterated their confrontation objections to Lawrence's testimony in conjunction with the trial court's determination that the death certificate for Ruiz would be admitted into evidence. They raised them again when the subject of admission of the autopsy report arose. When the trial court wondered why the report was needed when Lawrence's testimony had been admitted, the prosecutor observed that in Beeler, both the report and the testimony were admitted. The prosecutor expressed concern with laying the foundation for admissibility of Lawrence's testimony. Upon learning that enlargements of the diagrams attached to the report had been admitted into evidence, the trial court declined to admit the autopsy report. Appellants then withdrew their objections to the report. After defense counsel conferred, and apparently speaking for all of them, Nichols's attorney said: "We are going to go ahead, Your Honor, on this one we would, without waiving our issues with respect to the right of confrontation, we are—and in light of the testimony that was brought in by Dr. Lawrence, we withdraw our objection to receiving [the autopsy report]." Counsel explained: "The objection to the report was based on the denial of right of confrontation, and Dr. Lawrence was relying upon this report, Your Honor. We objected to any of his testimony and also objected to the admission of the report as a denial of confrontation. This Court has already, in essence, ruled against us on the issue of denial of confrontation. And since that ruling has, in essence, in my mind, already occurred, we are withdrawing our objection to the admissibility on all other grounds...." The prosecutor promptly withdrew the autopsy report, saying the defense could move it in on their own if they wanted. Counsel for Trice moved it into evidence without objection. When counsel for Nichols stated, "With the previous notation about the right of confrontation," the prosecutor responded, "Which is now waived." The court cautioned that if there was no objection to the report, it would come in without preserving anything for the appeal, then admitted the autopsy report into evidence.

b. The criminalist's report

Ronald Welsh, a senior criminalist for the California Department of Justice, testified as a ballistics expert. In June 2003, he was asked to do further examination of firearms and cartridges relating to .380–caliber evidence. He received a Lorcin .380–caliber pistol from MPD. Apparently he was not present when it first came into the laboratory, and some other firearms examiners in the laboratory received the gun. Firearms normally are submitted to the property department, but this gun could not be unloaded and so needed to be examined immediately by a firearms examiner and rendered safe. According to the notes of Sarah Yoshida, an experienced firearms examiner with whom Welsh had worked for years and who had more years in firearms examination than he did, the pistol was jammed—basically rusted shut. The gun had to be forced open and a loaded cartridge (unfired bullet) driven out of the gun with a cleaning rod. The defense's hearsay and confrontation objections were overruled.

Welsh's examination of the gun showed its condition was consistent with long exposure to the elements. It was very rusty, with extreme corrosion in the chamber and barrel. Different parts of the gun were rusted in place. The gun's condition was consistent with it sitting outside in a field for six or eight months. Welch examined the cartridge and found it too was coated with rust. That rust was from the gun, because it was an aluminum cartridge case, which does not rust. Because the chamber had become pitted and rusty, it had damaged the cartridge and

40

coated it with rust. The cartridge manufacturer was CCI. Welsh was also given a CCI Blazer .380 semiautomatic cartridge, which was evidence item number 46 in this case. The similarities between the two were that they were made by the same manufacturer and were the same caliber. Welsh was unable to perform any analysis to determine if there were any other points of similarity, since the majority of marks on a cartridge are left when it is fired. The one had not been fired, plus it was damaged from the rust.

  2. Analysis

The confrontation clause of the Sixth Amendment to the United States Constitution provides that "[i]n all criminal prosecutions, the accused shall enjoy the right ... to be confronted with the witnesses against him." Until 2004, when <u>Crawford</u> was decided, the admission of an unavailable witness's out-of-court statements against a criminal defendant was governed by <u>Ohio v. Roberts</u> (1980) 448 U.S. 56 (<u>Roberts</u>), which held that such statements could be admitted consistent with the confrontation clause only when the evidence fell within "a firmly rooted hearsay exception," or the statements contained "particularized guarantees of trustworthiness" such that adversarial testing would add little to the statements' reliability. (<u>Id</u>. at p. 66, fn. omitted.)

<u>Beeler, supra</u>, 9 Cal.4th 953, was decided in 1995, while <u>Roberts</u> was still controlling. In <u>Beeler</u>, Dr. Bolduc, the pathologist who conducted the autopsy on the victim, did not testify at trial. Instead, the prosecutor called a pathologist who did not participate in the autopsy to testify regarding the autopsy report. The report itself was admitted, over the defendant's objection, under Evidence Code section 1271. On appeal, the defendant claimed admission of the report was error for various reasons, including violation of the defendant's right to confront and cross-examine Bolduc. (<u>Beeler, supra</u>, at p. 978.) The California Supreme Court found no error. It examined the requirements of Evidence Code section 1271, and found that none of Bolduc's conclusions, including those with regard to the cause of death, were inadmissible under that statute. (<u>Beeler, supra</u>, at p. 981.) Since the report was properly admitted under Evidence Code section 1271, the court further concluded, the defendant's right of confrontation was not violated. (<u>Beeler, supra</u>, at p. 980.)

In <u>Crawford, supra</u>, 541 U.S. 36, the United States Supreme Court repudiated <u>Roberts</u> and held that testimonial out-of-court statements offered against a criminal defendant are inadmissible under the Sixth Amendment unless the witness is unavailable to testify and the defendant had a prior opportunity for cross-examination. (<u>Crawford, supra</u>, at pp. 59, 68.) Where nontestimonial hearsay is at issue, evidence is exempt "from Confrontation Clause scrutiny altogether" and may be admitted pursuant to the hearsay law. (<u>Id</u>. at p. 68.) The court declined to give a precise definition of "testimonial statements," although "'statements that were made under circumstances which would lead an objective witness reasonably to believe that the statement would be available for use at a later trial'" was given as one formulation of the phase. (<u>Id</u>. at pp. 51–52.)

In <u>Davis v. Washington</u> (2006) 547 U.S. 813 (<u>Davis</u>), the United States Supreme Court expanded on <u>Crawford</u>. Although declining to attempt to classify all conceivable statements—even those made in response to questioning by police—as either testimony or nontestimonial, it did further define the categories, saying: "Statements are nontestimonial when made in the course of police interrogation under circumstances objectively indicating that the primary purpose of the interrogation is to enable police assistance to meet an ongoing emergency. They are testimonial when the circumstances objectively indicate that there is no such ongoing emergency, and that the primary purpose of the interrogation is to establish or prove past events potentially relevant to later criminal prosecution." (<u>Davis, supra</u>, at p. 822, fn. omitted.)

<u>Davis</u> applied these distinctions to two factual situations to determine "when statements made to law enforcement personnel during a 911 call or at a crime scene are 'testimonial' and thus

subject to the requirements of the Sixth Amendment's Confrontation Clause." (Davis, supra, 547 U.S. at p. 817.) Davis held that the tape recording of a domestic disturbance victim's telephone call to a 911 operator was not testimonial under Crawford, even though the 911 operator asked the victim questions about the incident, because a 911 call is usually not designed primarily to establish a past fact, but to describe current circumstances that require police assistance. (Davis, supra, at pp. 817–819, 827.) The victim on the 911 call was "speaking about events as they were actually happening, rather than 'describ[ing] past events' ... [citation]." (Id. at p. 827.) In contrast, a domestic violence victim's statements to police officers, given in the course of their investigation, were testimonial and inadmissible in the absence of the victim's trial testimony, because the victim spoke to officers about the assault after the incident happened, she gave her statements to the officers as part of an investigation into possible past criminal conduct, and there was no emergency in progress and no immediate threat to the victim. (Id. at pp. 819–821, 829–830.)

In People v. Cage (2007) 40 Cal.4th 965, the California Supreme Court derived several basic principles from Davis. "First, ..., the confrontation clause is concerned solely with hearsay statements that are testimonial, in that they are out-of-court analogs, in purpose and form, of the testimony given by witnesses at trial. Second, though a statement need not be sworn under oath to be testimonial, it must have occurred under circumstances that imparted, to some degree, the formality and solemnity characteristic of testimony. Third, the statement must have been given and taken primarily for the purpose ascribed to testimony—to establish or prove some past fact for possible use in a criminal trial. Fourth, the primary purpose for which a statement was given and taken is to be determined 'objectively,' considering all the circumstances that might reasonably bear on the intent of the participants in the conversation. Fifth, sufficient formality and solemnity are present when, in a nonemergency situation, one responds to questioning by law enforcement officials, where deliberate falsehoods might be criminal offenses. Sixth, statements elicited by law enforcement officials are not testimonial if the primary purpose in giving and receiving them is to deal with a contemporaneous emergency, rather than to produce evidence about past events for possible use at a criminal trial." (People v. Cage, supra, at p. 984, fns. omitted.)

In People v. Geier (2007) 41 Cal.4th 555 (Geier), the California Supreme Court addressed an issue arising under Crawford that did not involve statements given to law enforcement officials. In Geier, an expert testified to her opinion concerning a DNA match and its statistical significance, based on testing she did not personally conduct. The testifying expert was the laboratory director for an accredited private laboratory that performed DNA tests for both the prosecution and the defense, and she reviewed the work performed by the analyst who conducted the actual tests. At trial, the defendant objected to the expert's testimony, arguing the evidence violated his Sixth Amendment rights because she did not personally conduct the tests. (Geier, supra, at pp. 593–596.)

Geier reviewed Crawford and Davis with respect to whether a statement is testimonial under the Sixth Amendment and stated: "[W]hat we extract from those decisions is that a statement is testimonial if (1) it is made to a law enforcement officer or by or to a law enforcement agent and (2) describes a past fact related to criminal activity for (3) possible use at a later trial. Conversely, a statement that does not meet all three criteria is not testimonial." (Geier, supra, 41 Cal.4th at p. 605.) Based on this interpretation, the California Supreme Court concluded that the circumstances under which the testing analyst prepared the DNA report meant such evidence was not testimonial. (Id. at p. 607.) The court emphasized that the observations of the person who actually conducted the testing and prepared the report "constitute a contemporaneous recordation of observable events rather than the documentation of past events. That is, she recorded her observations regarding the receipt of the DNA samples, her preparation of the samples for analysis, and the results of that analysis as she was actually performing those tasks. 'Therefore, when [she] made these observations, [she]—like the

declarant reporting an emergency in Davis—[was] "not acting as [a] witness [ ];" and [was] "not testifying." ' [Citation.]" (Geier, supra, at pp. 605–606.)

The state high court acknowledged that the DNA report was requested by a police agency and the laboratory's employees were paid for their work as part of a government investigation. (Geier, supra, 41 Cal.4th at p. 605.) It concluded, however, that "'the proper focus [about whether an out-of-court statement is testimonial] is not on the mere reasonable chance that an out-of-court statement might later be used in a criminal trial.' [Citations.]" (Ibid.) "In our view, under Davis, determining whether a statement is testimonial requires us to consider the circumstances under which the statement was made. As we read Davis, the crucial point is whether the statement represents the contemporaneous recordation of observable events." (Geier, supra, at p. 607.) Geier held the analyst's notes were admissible because they "were made 'during a routine, non-adversarial process meant to ensure accurate analysis.' [Citations.] In simply following [the laboratory's] protocol of noting carefully each step of the DNA analysis, recording what she did with each sample received, [the analyst] did not 'bear witness' against defendant. [Citation.] Records of laboratory protocols followed and the resulting raw data acquired are not accusatory. 'Instead, they are neutral, having the power to exonerate as well as convict.' [Citation.]" (Ibid.)

In Melendez–Diaz v. Massachusetts (2009) 557 U.S. —— [129 S .Ct. 2527](Melendez–Diaz ), a case decided after appellants were convicted but while the instant appeal was pending, the prosecution introduced three notarized "'certificates of analysis'" that showed the results of forensic analysis performed on material seized by police and connected to the defendant. The certificates, which were admitted over the defendant's Sixth Amendment objection, reported the weight of the seized bags, and that the substances were examined and found to contain cocaine. The certificates complied with state law and were sworn before a notary public by analysts from the state's crime laboratory, but no analyst testified at trial. (Id. at pp. 2530–2531.)

The United States Supreme Court held that admission of the certificates, in the absence of the trial testimony of the analysts who tested the contraband, violated the defendant's Sixth Amendment rights because there was "little doubt" the certificates fell "within the 'core class of testimonial statements'" subject to the Sixth Amendment restrictions described in Crawford. (Melendez–Diaz, supra, 129 S.Ct. at p. 2532.) "The 'certificates' are functionally identical to live, in-court testimony, doing 'precisely what a witness does on direct examination.' [Citation.]" (Ibid.) While state law described the documents as "'certificates,'" Melendez–Diaz held they were "quite plainly affidavits" and "'"made under circumstances which would lead an objective witness reasonably to believe that the statement would be available for use at a later trial."'" [Citation.]" (Ibid.) Moreover, the "sole purpose" of the affidavits under state law "was to provide 'prima facie evidence of the composition, quality, and the net weight' of the analyzed substance [citation]." (Ibid., italics omitted.)

The high court rejected the argument that there is a difference, for confrontation clause purposes, between testimony recounting historical events and testimony that is the result of neutral, scientific testing, finding it "little more than an invitation to return to our overruled decision in Roberts, [supra,] 448 U.S. 56." (Melendez–Diaz, supra, 129 S.Ct. at p. 2536.) The court also rejected the argument that the affidavits were admissible without confrontation because they were akin to official and business records: "Documents kept in the regular course of business may ordinarily be admitted at trial despite their hearsay status. [Citation.] But that is not the case if the regularly conducted business activity is the production of evidence for use at trial." (Id. at p. 2538.) "Business and public records are generally admissible absent confrontation not because they qualify under an exception to the hearsay rules, but because— having been created for the administration of an entity's affairs and not for the purpose of establishing or proving some fact at trial—they are not testimonial. Whether or not they qualify as business or official records, the analysts' statements here—prepared specifically for use at

43

[the defendant's] trial—were testimony against [him], and the analysts were subject to confrontation under the Sixth Amendment." (Id. at pp. 2539–2540.)

Justice Scalia's plurality opinion in Melendez–Diaz was joined by three other justices. Justice Thomas filed a short concurring opinion, which stated that he joined the court's opinion "because the documents at issue in this case 'are quite plainly affidavits,' [citation]. As such, they 'fall within the core class of testimonial statements' governed by the Confrontation Clause. [Citation.]" (Melendez–Diaz, supra, 129 S.Ct. at p. 2543 (conc. opn. of Thomas, J.).)

At the time the United States Supreme Court decided Melendez–Diaz, a petition for writ of certiorari in Geier was pending before the court. The court denied the petition, without comment, four days after deciding Melendez–Diaz. (Geier v. California (2009) —— U.S. —— [129 S.Ct. 2856].) California's intermediate courts have since come to differing conclusions concerning Geier's continuing viability following Melendez–Diaz, and the California Supreme Court has granted review in a number of cases in order to address the issue. (E.g., People v. Rutterschmidt (2009) 176 Cal.App.4th 1047, review granted Dec. 2, 2009, S176213; People v. Dungo (2009) 176 Cal.App.4th 1388, review granted Dec. 2, 2009, S176886; People v. Lopez (2009) 177 Cal.App.4th 202, review granted Dec. 2, 2009, S177046; People v. Gutierrez (2009) 177 Cal.App.4th 654, review granted Dec. 2, 2009, S176620; People v. Bowman (2010) 182 Cal.App.4th 1616, review granted June 9, 2010, S182172.)

In the present case, with respect to the autopsy evidence, Lawrence did not simply testify as a proxy for Rulon. Instead, he reviewed the autopsy photographs in addition to her report, and was able to offer his own opinion concerning the severity of Ruiz's wounds and the cause of death, and as to whether Rulon's conclusions were correct. We need not decide whether these circumstances are significant, nor do we need to take sides in the debate over Geier or, for that matter, offer our opinion concerning the continued vitality of cases such as Beeler and People v. Clark, supra, 3 Cal.4th 41, at pages 158–159, which, like Beeler, deals with one physician testifying about the report of the physician who actually conducted the autopsy, and admission of that report as a public or business record. Assuming error, it did not prejudice appellants.

A violation of the confrontation clause is subject to harmless-error analysis under the Chapman standard. (Geier, supra, 41 Cal.4th at p. 608; People v. Mitchell (2005) 131 Cal .App.4th 1210, 1225 & fn. 42; see People v. Ledesma (2006) 39 Cal .4th 641, 709.) The question is whether we can find, beyond a reasonable doubt, "that the jury verdict would have been the same absent any error. [Citations.]" (People v. Harrison (2005) 35 Cal.4th 208, 239.)
The answer here is yes. With respect to the autopsy evidence, appellants not only withdrew their objections to admission of Rulon's report itself, but Trice actually moved it into evidence without objection from any other party. Once received without objection, the report was in evidence for all purposes. (See Wicktor v. Los Angeles County (1960) 177 Cal.App.2d 390, 406; People v. O'Brien (1932) 122 Cal.App. 147, 155; People v. Hickok (1921) 56 Cal.App. 13, 17.) Appellants could not affirmatively seek admission of the report while still preserving their Sixth Amendment objections thereto.

Once the autopsy report was in evidence, any error in admitting Lawrence's testimony cannot possibly have impacted the verdict, since the pertinent evidence was already before the jury in the form of Rulon's report. Moreover, appellants did not seriously dispute that Ruiz was shot to death or that he was shot multiple times.  (See People v. Williams (1959) 174 Cal.App.2d 364, 391.)  Berenice Sanchez, the Ruizes' neighbor, described seeing Ruiz bleeding from the chest. The first officers on the scene testified that Ruiz had been shot and was bleeding profusely. Detective Buehler witnessed three .22–caliber slugs being recovered from Ruiz's body during the autopsy, including one from the neck. Neither the autopsy report nor Lawrence's testimony shed any light on whether Ruiz was shot by multiple firearms; Lawrence explained that unless a bullet was found in a wound, he could not determine the caliber of the gun. Testimony concerning the trajectory of the shots and stippling (or absence thereof) added little or nothing.

44

Lawrence's testimony (based on the report) that Ruiz was six feet tall and approximately 240 pounds was elicited by Nichols and can only have been beneficial to him, as it enabled him to attack T.'s identification of him as one of the perpetrators by suggesting he was about Ruiz's size and not around the five feet eight inches that was contained in T.'s original description to police.

With respect to the evidence concerning the Lorcin pistol, appellants do not explain, and we fail to see, how Welsh's testimony concerning Yoshida's report had any effect whatsoever. Herbert Brownlee testified to the gun's condition when he found it, including the fact it had a live round in the chamber. That Welsh personally examined the gun himself is clear from his statement that he disassembled the weapon, and none of his conclusions about the gun or the cartridge were dependent upon Yoshida's report or the notes of any other firearms examiners.

(LD 4, pp. 67-81).

2. Federal Standard.

Generally, the admissibility of evidence is a matter of state law, and is not reviewable in a federal habeas corpus proceeding. Estelle, 502 U.S. at 67; Middleton v. Cupp, 768 F.2d 1083, 1085 (9th Cir.), cert. denied, 478 U.S. 1021 (1985). Nevertheless, there can be habeas relief for the admission of prejudicial evidence if the admission was fundamentally unfair and resulted in a denial of due process. Estelle, 112 S.Ct. at 482; Pulley v. Harris, 465 U.S. 37, 41, 104 S.Ct. 871, 874 (1984); Walters v. Maas, 45 F.3d 1355, 1357 (9th Cir. 1995); Jeffries v. Blodgett, 5 F.3d 1180, 1192 (9th Cir. 1993), cert. denied, 510 U.S. 1191, 114 S.Ct. 1294 (1994); Gordon v. Duran, 895 F.2d 610, 613 (9th Cir.1990). However, the failure to comply with state rules of evidence alone is neither a necessary nor a sufficient basis for granting federal habeas relief on due process grounds. Jammal v. Van de Kamp, 926 F.2d 918, 919-920 (9th Cir. 1991). Only if there are no permissible inferences that the jury may draw from the evidence can its admission rise to the level of a due process violation. Id. at 920. Intent is a permissible inference that the jury may draw from the evidence of prior bad acts. See Houston v. Roe, 177 F.3d 901, 910 n. 6 (9th Cir. 1999).

The Confrontation Clause of the Sixth Amendment provides that in criminal cases the accused has the right to "be confronted with the witnesses against him." U.S. Const. amend. VI. The federal confrontation right applies to the states through the Fourteenth Amendment. Pointer v. Texas, 380 U.S. 400, 403, 85 S.Ct. 1065 (1965).

The ultimate goal of the Confrontation Clause is to ensure reliability of evidence, but it is a procedural rather than a substantive guarantee. Crawford v. Washington, 541 U.S. 36, 61, 124 S.Ct.

1   1354 (2004).  The Clause commands not that evidence be reliable, but that reliability be assessed in a

2   particular manner: by testing in the crucible of cross-examination.  Id.; see Davis v. Alaska, 415 U.S.

3   308, 315–16, 94 S.Ct. 1105 (1974). The Confrontation Clause applies to all "testimonial" statements.

4   Crawford, 541 U.S. at 50–51. "Testimony ... is typically a solemn declaration or affirmation made for

5   the purpose of establishing or proving some fact." Id. at 51.

6          3.  Analysis.

7        Over the course of the past decade, the Supreme Court has changed the doctrinal landscape

8   governing admission of laboratory reports.  A decade ago, Crawford held that the Confrontation Clause

9   prohibits the admission of "testimonial" out-of-court statements by non-testifying individuals. The

10  Court in Crawford did not define "testimonial statements."  Subsequently, in Melendez–Diaz v.

11  Massachusetts, 557 U.S. 305, 129 S.Ct. 2527 (2009), the Court held that forensic laboratory reports are

12  testimonial and that criminal defendants therefore have a right to cross-examine regarding their

13  contents.  Melendez–Diaz did not address the question whether the witness produced to testify about

14  the report must be its author.  More recently, in Bullcoming v. New Mexico, ––– U.S. ––––, 131 S.Ct.

15  2705, 180 L.Ed.2d 610 (2011), the Supreme Court held that the analyst who prepared a report must

16  personally testify about it to avoid a Confrontation Clause violation.

17       Petitioner's trial took place in 2007, after Crawford but before Melendez–Diaz and Bullcoming.

18  During this period, it was not "clearly established" within the meaning of § 2254 that forensic

19  laboratory reports were testimonial. Meras v. Sisto, 676 F.3d 1184, 1190 (9th Cir.2012).  Because

20  Crawford did not require the conclusion that the witness' testimony about the other medical report

21  violated the Confrontation Clause, the state court's adjudication was not an unreasonable application of

22  "clearly established" federal law. Id. (state court's approval of testimony by analyst's supervisor was not

23  objectively unreasonable after Crawford but before Melendez–Diaz and Bullcoming); see also Green v.

24  Fischer, — U.S. ––––, 132 S.Ct. 38, 44, 181 L.Ed.2d 336 (2011) (review under § 2254 limited to

25  reasonableness of state court decision under Supreme Court precedents announced "as of the time the

26  state court renders its decision").

27       Moreover, the Supreme Court's decision in Bullcoming was not made retroactively applicable to

28  cases on collateral review. See Tyler v. Cain, 533 U.S. at 663, 121 S.Ct. at 2482  ("[A] new rule is not

made 'retroactive to cases on collateral review' unless the Supreme Court holds it to be retroactive.")[4] Hence, the current standard set forth in <u>Bullcoming</u> is not applicable to Petitioner's case.

Finally, even assuming this case fell within the ambit of <u>Bullcoming</u>, the state court's conclusion that the error was harmless beyond a reasonable doubt under <u>Chapman v. California</u>, 386 U.S. 18, 87 S.Ct. 824 (1967), is not objectively unreasonable.  The 5th DCA pointed out that at trial the defendants withdrew their objections to the admission of the autopsy report and that Trice, one of the defendants, actually moved for its admission into evidence.  Once the autopsy report was in evidence, "any error in admitting Lawrence's testimony cannot possibly have impacted the verdict, since the pertinent evidence was already before the jury in the form of Rulon's report."  (Doc. 4, p. 81).  Also, as noted by the state court, nobody "seriously dispute[d]" that the victim was shot to death or that he had been shot multiple times.  Since neither the autopsy report nor the expert's testimony "she any light on whether [the victim] was shot by multiple firearms," and since the "[t]testimony concerning the trajectory of the shots and stippling (or absence thereof) added little or nothing," the Court concludes <u>Brecht</u>'s "more forgiving" harmless error standard, <u>Fry v. Pliler</u>, 551 U.S. at 116, dictates the same "harmless error" conclusion as that reached by the 5th DCA when it applied <u>Chapman</u>.  <u>Brecht</u>, 507 U.S. at 637.

E.  <u>Sufficiency Of The Evidence Regarding The Firearm Enhancement</u>

Finally, Petitioner claims that insufficient evidence was presented for the firearm enhancement.  Specifically, Petitioner contends that even accepting as true the evidence that Petitioner fired the Lorcin .380, there was no evidence that the bullets fired by Petitioner hit the victim.  Petitioner also contends that the state appellate court advanced a theory of "concurrent causation" that was never submitted to the jury at trial, thus violating his Sixth Amendment confrontation rights.  For the reasons discussed below, the Court finds these contentions to be without merit.

---

[4] In addition, the <u>Bullcoming</u> court noted that it expressed no view on whether the error was harmless, because, unlike the appellate division in this case, the lower court did not reach the issue. <u>See</u> 131 S.Ct. at 2719, n. 10 ("[N]othing in this opinion impedes a harmless-error inquiry on remand."); <u>see also Melendez–Diaz v. Massachusetts</u>, 557 U.S. 305, 129 S.Ct. 2527, 2542 n. 14, 174 L.Ed.2d 314 ("We of course express no view as to whether the error was harmless....Today's opinion, while insisting upon retention of the confrontational requirement, in no way alters the type of evidence (including circumstantial evidence) sufficient to sustain a conviction.")  Historically, Confrontation Clause violations are subject to harmless error analysis under <u>Chapman v. California</u>, 386 U.S. 18, 87 S.Ct. 824 (1967). <u>Delaware v. Van Arsdall</u>, 475 U.S. 673, 684, 106 S.Ct. 1431 (1986).

1        1. <u>The 5th DCA's Opinion</u>.

The 5th DCA rejected Petitioner's claim as follows:

Appellants contend the firearm discharge enhancements must be stricken for failure of proof. We agree with respect to Nichols, but disagree with respect to Dean and Trice.

        1. Background

As previously described, firearm discharge enhancement allegations, pursuant to section 12022.53, subdivisions (b), (c), (d) and (e)(1),67 were charged and found true with respect to counts I, III, and IV. At sentencing, the prosecutor observed that subdivision (e)(1) was rendered inapplicable by the trial court's having struck the gang enhancements, but subdivision (d) still resulted in an enhancement of 25 years to life. As a result, the trial court struck the enhancements alleged pursuant to subdivision (e)(1), but imposed sentence pursuant to subdivision (d).

No one objected to imposition of sentence under subdivision (d). Appellants now contend, however, that with the gang findings stricken, imposition of enhancements pursuant to subdivision (d) was unauthorized, as the evidence is insufficient to establish personal firearm discharge causing death or great bodily injury by each, or any, appellant.

        2. Analysis

"'The legislative intent behind section 12022.53 is clear: "The Legislature finds and declares that substantially longer prison sentences must be imposed on felons who use firearms in the commission of their crimes, in order to protect our citizens and to deter violent crime."' [Citations.]" (<u>People v. Palacios</u> (2007) 41 Cal.4th 720, 725.) To this end, and in recognition of different degrees of culpability, section 12022.53 imposes three gradations of punishment based on the seriousness of the type and consequences of the firearm use. (<u>People v. Grandy</u> (2006) 144 Cal.App.4th 33, 42.) The portions of section 12022.53 pertinent to the issue raised by appellants provide:

    "(d) Notwithstanding any other provision of law, any person who, in the commission of [murder (subd. (a)(1)) or robbery (subd. (a)(4)) ] ..., personally and intentionally discharges a firearm and proximately causes great bodily injury ..., or death, to any person other than an accomplice, shall be punished by an additional and consecutive term of imprisonment in the state prison for 25 years to life.

    "(e)(1) The enhancements provided in this section shall apply to any person who is a principal in the commission of an offense if both of the following are pled and proved:

    "(A) The person violated subdivision (b) of Section 186.22.

    "(B) Any principal in the offense committed any act specified in subdivision ... (d)."

Under the statute, a nonshooter cannot be subjected to enhanced punishment under subdivision (d) absent a gang finding under section 186.22, subdivision (b). This does not mean, however, that a shooter must personally inflict great bodily injury or death in order to be liable in the absence of a gang finding. While a subdivision (d) enhancement may most commonly be imposed where a bullet fired by the defendant strikes the victim (<u>see People v. Zarazua</u> (2008) 162 Cal.App.4th 1348, 1361), the plain language of subdivision (d) does not compel such a result, but instead requires that the shot fired by the defendant be a proximate cause of great

48

bodily injury or death. In other words, the shooter need not personally cause great bodily injury or death, but instead need only proximately cause such a result.

It has been held that "a defendant can proximately cause injury by discharging a firearm within the meaning of section 12022.53, subdivision (d) even if his or her bullet does not actually strike the victim." (People v. Palmer (2005) 133 Cal.App.4th 1141, 1150.) We agree. People v. Bland (2002) 28 Cal.4th 313 (Bland) is instructive. In that case, the defendant and a companion shot at a car containing three individuals, killing one and injuring the other two. Despite the fact the evidence was not clear who fired the shots that struck the two survivors, the defendant was convicted of murder and two counts of attempted murder, and jurors found true a subdivision (d) allegation with respect to all counts. (Bland, supra, at p. 318.)

The California Supreme Court held that the trial court had a sua sponte duty to define proximate causation, as the term has a technical meaning peculiar to the law. (Bland, supra, 28 Cal.4th at p. 334.) It approved jury instructions stating that (1) "'[a] proximate cause of great bodily injury or death is an act or omission that sets in motion a chain of events that produces as a direct, natural and probable consequence of the act or omission the great bodily injury or death and without which the great bodily injury or death would not have occurred' " (CALJIC No. 17.19.5), and (2) when the conduct of two or more persons contributes concurrently as a cause of the great bodily injury or death, the conduct of each is a cause of the great bodily injury or death if that conduct was a substantial factor contributing to the result, and a cause is concurrent if it was operative at the moment of the great bodily injury or death and acted with another cause to produce that result (CALJIC No. 3.41). (Bland, supra, at pp. 335, 336.)

In concluding that CALJIC No. 17.19.5 correctly defines proximate causation, the court rejected the determination by the Court of Appeal majority that the instruction was not a proper definition because it "'would permit a true finding on the enhancement based [on] the cohort's inflicting the death and injuries and defendant's aiding and abetting him simply by also firing a gun. The enhancement cannot be found true unless defendant personally fired the bullets which struck the victim.'" (Bland, supra, 28 Cal.4th at p. 335.) The Supreme Court stated: "Section 12022.53(d) requires that the defendant 'intentionally and personally discharged a firearm' ..., but only that he 'proximately caused' the great bodily injury or death. The jury, properly instructed, reasonably found that defendant did personally discharge a firearm. The statute states nothing else that defendant must personally do. Proximately causing and personally inflicting harm are two different things." (Bland, supra, at p. 336.) The court concluded: "A person can proximately cause a gunshot injury without personally firing the weapon that discharged the harm-inflicting bullet.... [¶] ... [S]ection 12022.53(d) does not require that the defendant fire a bullet that directly inflicts the harm. The enhancement applies so long as defendant's personal discharge of a firearm was a proximate, i.e., a substantial, factor contributing to the result." (Bland, supra, at pp. 337, 338; see, e.g., People v. Carrillo (2008) 163 Cal.App.4th 1028, 1036–1038 [although trial court erred by instructing that subd. (d) allegation was true if conduct of defendant or coperpetrator harmed victim but then failing to instruct that concurrent causes could operate together to determine proximate cause, allegation could be found true under circumstances where defendant was one of several persons who shot at victim, victim was struck by rounds fired from more than one gun, and there was no evidence defendant fired one of those guns]; People v. Zarazua, supra, 162 Cal.App.4th at pp. 1351, 1361–1362 [subd. (d) allegation properly found true where victim was killed in traffic collision that occurred when car in which he was riding was hit by car carrying two members of one gang, who were fleeing because of gunfire from car carrying members of rival gang, including defendants]; People v. Palmer, supra, 133 Cal.App.4th at p. 1145, 1149–1150 [subd. (d) allegation properly found true where police officer sustained broken ankle while diving for cover from shots fired by defendant, who, with his companion, was attempting to flee the scene after committed an armed robbery].)

49

In light of the foregoing, we have no trouble concluding that, when multiple gunmen shoot at a victim who is effectively trapped inside a small enclosed area such as a closet, and the victim is significantly injured or killed, all of the gunmen have proximately caused great bodily injury or death within the meaning of subdivision (d), regardless of whether it can be determined that any particular shooter or shooters personally fired the injurious or fatal shot or shots, and regardless of whether bullets fired by any particular shooter actually struck the victim. The question in the present case, then, is whether the evidence is sufficient to establish that any particular appellant or appellants personally and intentionally discharged a firearm at Ruiz.

Whether a defendant personally and intentionally discharged a firearm in the commission of an enumerated offense is a question for the trier of fact to decide. (People v. Masbruch (1996) 13 Cal.4th 1001, 1007.) The standard of appellate review applicable to such a question is settled. The test of sufficiency of the evidence is whether, reviewing the whole record in the light most favorable to the judgment below, substantial evidence is disclosed such that a reasonable trier of fact could find the essential elements of the crime beyond a reasonable doubt. (People v. Johnson (1980) 26 Cal.3d 557, 578; accord, Jackson v. Virginia (1979) 443 U.S. 307, 319.) Substantial evidence is that evidence which is "reasonable, credible, and of solid value." (People v. Johnson, supra, at p. 578.) An appellate court must "presume in support of the judgment the existence of every fact the trier could reasonably deduce from the evidence." (People v. Reilly (1970) 3 Cal.3d 421, 425.) An appellate court must not reweigh the evidence (People v. Culver (1973) 10 Cal.3d 542, 548), reappraise the credibility of the witnesses, or resolve factual conflicts, as these are functions reserved for the trier of fact (In re Frederick G. (1979) 96 Cal.App.3d 353, 367). This standard of review is applicable regardless of whether the prosecution relies primarily on direct or on circumstantial evidence (People v. Lenart (2004) 32 Cal.4th 1107, 1125), and applies to enhancements as well as convictions (People v. Wilson (2008) 44 Cal.4th 758, 806).

Viewed in accordance with the foregoing principles, the evidence showed that appellants were three of the four intruders T. saw in her home on the evening of March 3, 2002. All were armed. Although T. could not positively identify any of the guns, given where guns were found after the shooting and T.'s testimony that they looked similar to the weapons she saw that night, a reasonable inference can be drawn that Trice had the .22–caliber rimfire revolver, Dean had the Lorcin .380 semiautomatic, and Nichols had a big black gun that was never found because he took it with him after the shooting.

T.'s testimony established that appellants all had their guns in their hands prior to the shooting. There was no evidence their guns ever left their hands until after Ruiz was shot. Trice and Nichols forced Ruiz to the walk-in closet in the bedroom. T. saw Trice at the entrance of the closet door. She lost sight of Ruiz at the closet door. Trice and Nichols took Ruiz into the closet. Through the half-open door, T. could see the back of Nichols's shirt inside. Although she could not see whether there was anyone in the closet besides Ruiz and Nichols, since T. did not see Trice anywhere, it can reasonably be inferred he was inside the closet when the shooting started.

When the gunfire erupted, T. saw Dean go to the closet door and start shooting into the closet at a downward angle, using a gun that appeared similar to the Lorcin .380 that was subsequently found. She witnessed, she estimated, at least four shots going into the closet door. When Dean paused after firing a few shots, T. could hear other shots going off behind the door. It can reasonably be inferred that Trice was inside the closet, shooting, as four .22–caliber bullets from rimfire cartridges were recovered from Ruiz's body, and Ruiz's blood was on the cylinder of the .22–caliber revolver. Ruiz was shot many more times than the number of bullets recovered, however.

In light of the foregoing, there is ample evidence to support the subdivision (d) enhancements as to Dean and Trice, even without the gang findings. Although appellants attack T.'s and Collins's testimony, their credibility was for the jury to determine. There being substantial evidence to

50

1    support a conclusion Dean and Trice, in the commission of robbery and murder, personally and
2    intentionally discharged a firearm, proximately causing great bodily injury or death to a person
     who was not an accomplice, it necessarily follows the trial court did not err in sentencing
3    accordingly, notwithstanding the fact the subdivision (e)(1) allegations and gang enhancements
     were stricken. As to Dean and Trice, then, the subdivision (d) enhancements stand.

4    (LD 4, pp. 112-118).

5                    2.  Federal Standard.

6            The law on sufficiency of the evidence is clearly established by the Supreme Court of the

7    United States.  Pursuant to the Court's holding in Jackson v. Virginia, 443 U.S. 307, the test on habeas

8    review to determine if a factual finding is fairly supported by the record is as follows: "[W]hether, after

9    viewing the evidence in the light most favorable to the prosecution, any rational trier of fact could have

10   found the essential elements of the crime beyond a reasonable doubt." Id., 443 U.S. at 319; see also

11   Lewis v. Jeffers, 497 U.S. 764, 781 (1990).  Thus, only if "no rational trier of fact" could have found

12   proof of guilt beyond a reasonable doubt will a petitioner be entitled to habeas relief.  Jackson, 443 U.S.

13   at 324.  Sufficiency claims are judged by the elements defined by state law.  Id. at 324, n. 16.

14           A federal court reviewing collaterally a state court conviction does not determine whether it is

15   satisfied that the evidence established guilt beyond a reasonable doubt.  Payne v. Borg, 982 F.2d 335,

16   338 (9th Cir. 1992).  The federal court "determines only whether, 'after viewing the evidence in the

17   light most favorable to the prosecution, any rational trier of fact could have found the essential

18   elements of the crimes beyond a reasonable doubt.'" See id., quoting Jackson, 443 U.S. at 319.  Only

19   where no rational trier of fact could have found proof of guilt beyond a reasonable doubt may the writ

20   be granted.  See Jackson, 443 U.S. at 324; Payne, 982 F.2d at 338.

21           If confronted by a record that supports conflicting inferences, a federal habeas court "must

22   presume–even if it does not affirmatively appear in the record–that the trier of fact resolved any such

23   conflicts in favor of the prosecution, and must defer to that resolution."  Jackson, 443 U.S. at 326.  A

24   jury's credibility determinations are therefore entitled to near-total deference.  Bruce v. Terhune, 376

25   F.3d 950, 957 (9th Cir. 2004).  Except in the most exceptional of circumstances, Jackson does not

26   permit a federal court to revisit credibility determinations.  See id. at 957-958.

27           Circumstantial evidence and inferences drawn from that evidence may be sufficient to sustain a

28   conviction.  Walters v. Maass, 45 F.3d 1355, 1358 (9th Cir. 1995).  However, mere suspicion and

speculation cannot support logical inferences.  Id.; see, e.g., Juan H. v. Allen, 408 F.3d 1262, 1278-1279 (9th Cir. 2005)(only speculation supported conviction for first degree murder under theory of aiding and abetting).

After the enactment of the AEDPA, a federal habeas court must apply the standards of Jackson with an additional layer of deference.  Juan H., 408 F.3d at 1274.  Generally, a federal habeas court must ask whether the operative state court decision reflected an unreasonable application of Jackson and Winship to the facts of the case.  Id. at 1275.[5]

Moreover, in applying the AEDPA's deferential standard of review, this Court must presume the correctness of the state court's factual findings. 28 U.S.C. § 2254(e)(1); Kuhlmann v. Wilson, 477 U.S. 436, 459, 106 S.Ct. 2616 (1986).  This presumption of correctness applies to state appellate determinations of fact as well as those of the state trial courts.  Tinsley v. Borg, 895 F.2d 520, 525 (9th Cir.1990).  Although the presumption of correctness does not apply to state court determinations of legal questions or mixed questions of law and fact, the facts as found by the state court underlying those determinations are entitled to the presumption.  Sumner v. Mata, 455 U.S. 539, 597, 102 S.Ct. 1198 (1981).

In Cavazos, v. Smith, __U.S. __, 132 S.Ct. 2 (2011), the Supreme Court explained the highly deferential standard of review in habeas proceedings, by noting that Jackson

> makes clear that it is the responsibility of the jury—not the court—to decide what conclusions should be drawn from evidence admitted at trial. A reviewing court may set aside the jury's verdict on the ground of insufficient evidence only if no rational trier of fact could have agreed with the jury. What is more, a federal court may not overturn a state court decision rejecting a sufficiency of the evidence challenge simply because the federal court disagrees with the state court. The federal court instead may do so only if the state court decision was "objectively unreasonable." Renico v. Lett, 559 U.S. ——130 S.Ct. 1855, 1862, 176 L.Ed.2d 678 (2010) (internal quotation marks omitted).

> Because rational people can sometimes disagree, the inevitable consequence of this settled law is that judges will sometimes encounter convictions that they believe to be mistaken, but that they must nonetheless uphold.

Cavazos, 132 S.Ct. at 3.

---

[5]  Prior to Juan H., the Ninth Circuit had expressly left open the question of whether 28 U.S.C. § 2254(d) requires an additional degree of deference to a state court's resolution of sufficiency of the evidence claims.  See Chein v. Shumsky, 373 F.3d 978, 983 (9th Cir. 2004); Garcia v. Carey, 395 F.3d 1099, 1102 (9th Cir. 2005).

"Jackson says that evidence is sufficient to support a conviction so long as 'after viewing the evidence in the light most favorable to the prosecution, any rational trier of fact could have found the essential elements of the crime beyond a reasonable doubt.' 443 U.S., at 319, 99 S.Ct. 2781. It also unambiguously instructs that a reviewing court "faced with a record of historical facts that supports conflicting inferences must presume—even if it does not affirmatively appear in the record—that the trier of fact resolved any such conflicts in favor of the prosecution, and must defer to that resolution." Id., at 326, 99 S.Ct. 2781.

Cavazos, 132 S.Ct. at 6. [6]

       3. Analysis.

First, the Court notes the state court correctly applied the Jackson standard to this issue. Therefore, the only remaining question is whether the state court's adjudication was contrary to or an unreasonable application of that federal standard. For the reasons set forth below, the Court concludes that it was not.

Petitioner's dual contentions that insufficient evidence was presented that the bullets fired from his weapon hit the victim and that the state court improperly applied a "concurrent cause" theory to uphold the gun use enhancement are intertwined. The state law view that "[a] person can proximately cause a gunshot injury without personally firing the weapon that discharged the harm-inflicting bullet," People v. Bland, 28 Cal.4th 313, 337, 338 (2002), obviates any evidentiary requirement that proving the enhancement necessarily entails presenting evidence that Petitioner actually fired the bullets that struck the victim and caused his injuries and death. Thus, the Court cannot consider one issue without considering the other.

However in doing so, the Court finds itself dealing exclusively with a state law issue, i.e., the State of California's construction of the evidentiary requirements needed to trigger the gun use enhancement under Penal Code § 12022.53. The United States Supreme Court has "stated many times that 'federal habeas corpus relief does not lie for errors of state law.'" Estelle, 502 U.S. at 68, quoting Lewis, 497 U.S. at 780; Gilmore v. Taylor, 508 U.S. 333, 348-49 (1993) (O'Connor, J., concurring) ("mere error of state law, one that does not rise to the level of a constitutional violation, may not be

---

[6] To the extent that the 5th DCA's opinion does not expressly cite the Jackson v. Virginia standard in analyzing the sufficiency claims herein, it must be noted that, long ago, the California Supreme Court expressly adopted the federal Jackson standard for sufficiency claims in state criminal proceedings. People v. Johnson, 26 Cal.3d 557, 576 (1980). Accordingly, the state court applied the correct legal standard, and this Court's only task is to determine whether the state court adjudication was contrary to or an unreasonable application of that standard.

1 | corrected on federal habeas").  Indeed, federal courts are bound by state court rulings on questions of

2 | state law. <u>Oxborrow v. Eikenberry</u>, 877 F.2d 1395, 1399 (9th Cir.), *cert. denied*, 493 U.S. 942 (1989).

3 | Under that view, this Court is bound by the state supreme court's interpretation of that enhancement in

4 | <u>Bland</u>. Thus, as Respondent correctly argues, the state's interpretation of the requirements of proving

5 | beyond a reasonable doubt the elements of the enhancement set forth in Cal. Pen. Code § 12022.53 is

6 | not a basis for federal habeas review.

7 | However, even if that were not the case, Petitioner's argument still fails on the merits. The 5th

8 | DCA identified sufficient evidence in the state record to support a conclusion that, under California

9 | law, Petitioner used a weapon that was a "proximate cause" of the victim's serious injuries: e.g.,

10 | Petitioner entered the victim's home armed with a handgun and there was no evidence that Petitioner

11 | ever put the gun down; the victim's wife saw Petitioner go to the door of the closet in which the victim

12 | had been placed and start shooting into the closet at a downward angle; and this shooting by Petitioner

13 | occurred while other guns were being fired at the victim by Petitioner's compatriots.

14 | Viewing all of this evidence in the light most favorable to the prosecution, and giving the state

15 | court's ruling the deference required by federal habeas law, the Court concludes that a rational trier of

16 | fact could have found the essential elements of the enhancement beyond a reasonable doubt.  <u>Payne v.

17 | Borg</u>, 982 F.2d at 338; <u>see Jackson</u>, 443 U.S. at 319.  Thus, the state court's adjudication was not

18 | objectively unreasonable and the claim should be denied.

19 | ## **RECOMMENDATION**

20 | Accordingly, the Court RECOMMENDS that Petitioner's Petition for Writ of Habeas Corpus

21 | (Doc. 1), be DENIED with prejudice.

22 | This Findings and Recommendation is submitted to the United States District Court Judge

23 | assigned to the case, pursuant to the provisions of 28 U.S.C. § 636 (b)(1)(B) and Rule 304 of the Local

24 | Rules of Practice for the United States District Court, Eastern District of California.  Within twenty-one

25 | (21) days after being served with a copy of this Findings and Recommendation, any party may file

26 | written objections with the Court and serve a copy on all parties.  Such a document should be captioned

27 | "Objections to Magistrate Judge's Findings and Recommendation."  Replies to the Objections shall be

28 | served and filed within ten (10) <u>court</u> days (plus three days if served by mail) after service of the

Objections.  The Court will then review the Magistrate Judge's ruling pursuant to 28 U.S.C. § 636 (b)(1)(C).  The parties are advised that failure to file objections within the specified time may waive the right to appeal the Order of the District Court.  <u>Martinez v. Ylst</u>, 951 F.2d 1153 (9th Cir. 1991).

IT IS SO ORDERED.

Dated:   **February 13, 2014**          _____**/s/ Jennifer L. Thurston**
                                        UNITED STATES MAGISTRATE JUDGE